Rockingham
No. 88-203

THE STATE OF NEW HAMPSHIRE

v.

THOMAS PELLICCI

August 24, 1990

524

*Stephen E. Merrill*, attorney general (*Tina Schneider*, assistant attorney general, on the brief and orally), for the State.

*Stephen T. Jeffco*, of Portsmouth, by brief and orally, for the defendant.

JOHNSON, J. The defendant, Thomas Pellicci, appeals an order of the Superior Court (*Mohl*, J.) denying his motions to dismiss the charges against him or, alternatively, to suppress evidence. He ar-

gues that his stop, search, and ultimate arrest by the Portsmouth Police Department violated his rights against unreasonable search and seizure under part I, article 19 of the New Hampshire Constitution. For reasons that follow, I would affirm.

The superior court denied Pellicci's motions based on the following findings of fact, which remain unchallenged on appeal. Beginning in late June and continuing through late August 1987, the Portsmouth Police Department conducted an investigation of controlled substance sales in the Portsmouth area, concentrating its efforts on detecting such sales at the Club Excalibur, a Portsmouth drinking establishment. During July and August, a team of officers conducting surveillance at the club noted a suspicious pattern in the behavior of defendant Pellicci, who was then a club patron. On four or five documented occasions, Pellicci left the club with another patron, usually a female, and drove with that patron on precisely the same route from the club to either a municipal parking lot next to the BankEast Building or a neighboring parking lot at the South playground. In each instance, Pellicci and his passenger remained parked in one of the two lots for fifteen to twenty minutes, without exiting the vehicle, and then returned to the club. On one of these occasions, the passenger appeared to the officers to hand Pellicci money. On another, a member of the surveillance team saw a male, seated in the front passenger's seat, bend over twice at the waist, in a manner which, in his experience, was characteristic of persons inhaling cocaine.

On August 26, 1987, following the observations described above, a confidential source informed Portsmouth Detective Steven Demo that Pellicci sold cocaine from his vehicle on a regular basis, but that, fearing the presence of undercover officers, he refused to make sales in the Club Excalibur itself. According to Detective Demo's testimony, this informant also supplied information leading to the August 26th arrest of another person on a drug-related charge.

During the afternoon of August 27th, Detective Demo contacted Patrolman Michael Ronchi, who cares for and handles the Portsmouth Police Department's drug detection dog, and asked that he and Patrolman James Prendergast take up a position along the route Pellicci customarily followed between the club and the earlier-described parking lots. Detective Demo testified that he ordered the patrolmen to stop Pellicci's vehicle for investigation by the drug detection dog if Pellicci left the club with another patron and embarked on this customary route.

At 7:15 that evening, Pellicci did leave the club, with a female patron, and took the route he had followed to the parking lots on previous occasions. When he passed the spot where Patrolmen Ronchi and Prendergast were waiting, they pulled out behind him, and he stopped almost immediately. It is unclear whether the officers turned on their blue lights before Pellicci pulled over, or only after he had stopped and was exiting his vehicle. Patrolman Prendergast instructed Pellicci, who was leaving the area on foot, to return to his position behind the wheel and then requested his identification, while Patrolman Ronchi accompanied the drug detection dog around the outside of the vehicle. During their circuit, the dog "alerted" Patrolman Ronchi to the possible presence of controlled substances at the space between the passenger side door of the vehicle and the vehicle's frame, and at one of the wheel wells.

Following the dog's alert, Patrolman Ronchi directed Pellicci to exit the vehicle and performed a pat search of his clothing, uncovering a cigarette box in his shirt pocket. Ronchi testified that, in his experience, such boxes are often used to carry controlled substances. On opening this box, Ronchi discovered seven paper packets containing a white powder that appeared to him to be cocaine. The box also held three hand-rolled cigarettes. The patrolmen then arrested Pellicci and took him to the Portsmouth police station where, during booking, they also discovered among his possessions a vial containing a small amount of white powder. Later laboratory analysis confirmed that the paper packets and vial contained cocaine and that marijuana was present in the three cigarettes. On the basis of this evidence, a Rockingham County Grand Jury indicted Pellicci for the felonies of possession of cocaine and possession of cocaine with intent to sell, *see* RSA 318-B:2, I (Supp. 1989), and the Rockingham County Attorney filed two informations charging him with the misdemeanors of transportation and possession of marijuana, *see id.*

At the parties' request, the superior court consolidated a hearing on Pellicci's alternative motions to dismiss charges or suppress evidence with a jury-waived bench trial. It subsequently denied both motions and found Pellicci guilty of each of the four crimes with which he was charged. In denying the motions, the superior court determined, in response to arguments to the contrary, that: (1) Portsmouth police officers possessed facts sufficient to justify an investigative stop of Pellicci's vehicle for the purpose of allowing the drug detection dog to sniff its exterior; and (2) the dog's alert gave the officers probable cause to search Pellicci's person. The court fur-

ther denied Pellicci's request to reconsider its decision on the motions, and this appeal followed.

Pellicci challenges the superior court's determinations in several respects on appeal. He argues first that his detention was not a mere investigative stop, *see Terry v. Ohio*, 392 U.S. 1 (1968), which officers may conduct on the basis of a reasonable and articulable suspicion that the person detained has committed or is about to commit a crime, but was a full-blown seizure, demanding both probable cause to suspect criminal activity and a warrant, or circumstances sufficient to satisfy one of the established exceptions to the warrant requirement. Second, Pellicci says, if the initial seizure was properly characterized as an investigative stop, officers nevertheless lacked the reasonable and articulable suspicion necessary to justify such a stop. Third, even conceding appropriate justification, use of the drug detection dog was itself a search exceeding the bounds of the brief and very limited intrusion authorized, and therefore required probable cause. Finally, Pellicci contends, because the State failed to produce sufficient evidence of the drug detection dog's reliability, the superior court erred in finding that the dog's alert gave the officer probable cause to search his person. He argues that any of these violations requires the suppression of all evidence seized as a consequence, and that the resulting lack of evidence warrants dismissal of the charges against him.

The State responds that Pellicci's initial detention both was supported by a reasonable and articulable suspicion and was sufficiently brief and unintrusive to be classified appropriately as an investigative stop. Furthermore, it says, so far from being a search requiring probable cause, the use of the drug detection dog was not a search at all within the meaning of the State and Federal Constitutions. Finally, it claims, evidence as to the dog's reliability was clearly sufficient to support a determination of probable cause to search Pellicci's person, and all of the evidence in question was thus admissible at trial.

■■ An officer who stops a motor vehicle seizes both vehicle and occupants for purposes of part I, article 19 of the New Hampshire Constitution. *See State v. Parker*, 127 N.H. 525, 529, 503 A.2d 809, 811 (1985) (addressing State and Federal Constitutions); *State v. Oxley*, 127 N.H. 407, 410, 503 A.2d 756, 759 (1985) (addressing Federal Constitution). Under carefully defined circumstances, however, we have interpreted our constitution, like its federal counterpart, to permit certain investigative stops on the basis of less than probable

cause because they are substantially less intrusive than an arrest. *See State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137–38 (1985) (adopting the rule established in *Terry v. Ohio*, 392 U.S. at 26–27 (1968), that under some circumstances police may detain a person for investigatory purposes on grounds not amounting to probable cause to arrest).

In determining whether the grounds for a particular stop meet constitutional requirements, we balance the governmental interest that allegedly justified the stop against the extent of the intrusion on protected interests. *Parker, supra* at 530, 503 A.2d at 812. To this end, we require the investigating officer to have undertaken the stop on the basis of a reasonable suspicion that the person detained had committed, was committing, or was about to commit a crime, *State v. Maya*, 126 N.H. 590, 595, 493 A.2d 1139, 1143 (1985), and we insure that the adequacy of this suspicion is the subject of neutral scrutiny by requiring the officer to "'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *Brodeur supra* (quoting *Terry, supra* at 21). We further guarantee that the seizure is sufficiently unintrusive by permitting detentions on the basis of less than probable cause only where "'[t]he scope of the detention [is] carefully tailored to its underlying justification . . . [is] temporary and last[s] no longer than is necessary to effectuate the purpose of the stop.'" *Maya supra* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Thus the officer may detain the suspect briefly in order to ask "'a moderate number of questions to determine . . . identity and to try to obtain information confirming or dispelling [his] suspicions.'" *Parker, supra* at 531, 503 A.2d at 812–13 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Where he has reason to believe that the suspect is armed and dangerous, the officer may also insure his own safety or that of others by conducting a limited frisk of outer garments for weapons. *See Terry*, 392 U.S. at 27. However, "subsequent decisions [after Terry] have demonstrated that the exception for limited intrusions is not confined to the 'stop and frisk' situation presented in *Terry*." *United States v. Whitehead*, 849 F.2d 849, 856 (4th Cir. 1988) (citations omitted). "Any departure from the probable-cause requirement, however, 'rests on a balancing of the . . . nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

Pellicci's initial arguments challenge the constitutionality of his investigative stop by charging that the stop was not based on a reasonable and articulable suspicion that he had been, was, or was about to be engaged in criminal activity. In making these arguments, Pellicci emphasizes that the suspicious circumstances on which the State relies were as consistent with innocent as with criminal activity. He further argues that because officers planned the so-called stop in advance, with the intention of employing the drug detection dog to uncover controlled substances, it was not a response to a rapidly unfolding situation presenting the immediate threat of crime, as the State Constitution requires.

■ To determine the sufficiency of the officers' suspicion, an appellate court must consider the facts they articulated, not in isolation, but in light of all the surrounding circumstances, *Parker*, 127 N.H. at 529–30, 503 A.2d at 811–12, keeping in mind, in particular, that "a trained officer may make inferences and draw conclusions from conduct which may seem unremarkable to an untrained observer." *Parker, supra* at 531, 503 A.2d at 812.

To review briefly, the officers based their decision to make the stop on the fact that on four or five documented occasions, Pellicci, accompanied by a passenger, had left the Club Excalibur and taken an established route to one of two secluded parking lots, where they had remained parked for no more than twenty minutes before returning to the club. On one of these occasions, investigating officers saw what they believed to be money changing hands, and on another they observed behavior by the passenger which, in their experience, was consistent with cocaine inhalation. In addition, on the day before officers stopped Pellicci, the Portsmouth Police Department received a tip from an anonymous informant that Pellicci regularly sold drugs from his car. Information from the same informant resulted in an arrest on drug-related charges just prior to the stop in question.

■ Although some of these activities may appear innocent in isolation, when taken together and considered in light of the reasonable inferences that officers who are experienced in investigating drug transactions may draw, they suggest that Pellicci made his trips from the club to the parking lots in order to make drug sales. In combination with the anonymous tip, these articulated facts gave officers reasonable grounds for suspecting that, if Pellicci left the Club Excalibur and followed the route he had been observed to take on previous occasions, he would be carrying controlled substances in anticipation of immediate sale.

■ This review of the facts on which the officers based their stop further makes clear that, although they planned the stop in advance, its basis was their suspicion that Pellicci was committing one crime (possession and transportation of a controlled substance) and about to commit another (sale of a controlled substance), not their mere desire to acquire evidence of criminal activity. Patrolmen Ronchi and Prendergast did not stop Pellicci at some arbitrarily chosen moment; they stopped him when they had a reasonable and articulable suspicion, based on the evidence they had gathered, that he was carrying controlled substances whose sale was imminent. *Cf. United States v. Cortez*, 449 U.S. 411, 420 (1981) (brief investigative stop for questioning was held to be appropriate where officers planned that "if, on the night upon which they believed [the suspect] was likely to travel, sometime between 2 a.m. and 6 a.m., a large enclosed vehicle was seen to make an east-west-east round trip to and from a deserted point (milepost 122) on a deserted road (Highway 86), [they] would stop the vehicle on the return trip"). In light of the facts articulated, it is fair to conclude that the investigative stop was supported by a reasonable suspicion and was not a mere pretext to gather evidence without first obtaining a warrant.

■ We next consider whether use of the drug detection dog to sniff the exterior of Pellicci's vehicle for controlled substances went beyond the allowable scope of a limited investigative stop and was thus a full-fledged search, requiring probable cause. The State urges us to answer this question, which we have never addressed in the context of part I, article 19, by adopting the analysis the United States Supreme Court recently employed in *United States v. Place*, 462 U.S. 696, for purposes of the fourth amendment. However, as Pellicci correctly argues, we have held that our Constitution may be more protective of individual rights than the Federal Constitution, *see State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350–51 (1983).

In *Place*, police officers decided to subject luggage to a canine sniff after stopping its owner in LaGuardia Airport based on their reasonable and articulable suspicion that he was transporting narcotics. The Court ultimately found seizure of the luggage for ninety minutes, in anticipation of the dog's arrival, too intrusive to be justified on the basis of anything less than probable cause, and held for the defendant. *Place, supra* at 707–10. However, it added that, under the circumstances, the sniff itself was not a search: "We conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located

in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *Place, supra* at 707.

■ The Court provided justification for this conclusion, which as Justice Blackmun noted in concurrence was unnecessary to resolution of the case, *Place,* 462 U.S. at 723–24, by pointing to several characteristics of the canine sniff that distinguish it from those investigative methods properly classified as searches. In particular, it noted, a canine sniff of luggage is less intrusive than the typical search because it does not involve opening the luggage and discloses nothing about the contents beyond the presence or absence of controlled substances. *Place, supra* at 707. Unlike the typical search, then, the sniff provides only limited information about the item investigated, and avoids the "embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *Place supra.* "In these respects," the Court concluded, "the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Place supra.* Given this language, the majority of courts have since concluded that a canine sniff was not a search and therefore was not subject to fourth amendment restrictions.

Part I, article 19 of our Constitution accords

"[e]very subject . . . a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions."

There is no question that part I, article 19 gave Pellicci a right to be secure from unreasonable searches of his vehicle. *See, e.g., Ball,* 124 N.H. at 234–37, 471 A.2d at 352–54 (part I, article 19 prevented officer from reaching into defendant's car to seize hand-rolled cigarette absent probable cause to believe it contained controlled substances). What must be considered here is (1) whether the canine sniff of the vehicle's exterior was a search in constitutional terms, and (2) if it was, what requirements are imposed by part I, article 19 to insure that it was reasonable.

■■ Unlike the United States Supreme Court, we have neither adopted nor rejected the reasonable expectation of privacy analysis for purposes of determining what constitutes an invasion of protected interests under part I, article 19. *See State v. Valenzuela,* 130 N.H. 175, 180–81, 536 A.2d 1252, 1256–57 (1987), *cert. denied,* 485

U.S. 1008 (1988). However, in considering what constitutes a search for purposes of our Constitution, we have stated that "'[a] search ordinarily implies a quest by an officer of the law, a prying into hidden places for that which is concealed.'" *State v. McGann*, 124 N.H. 101, 104, 467 A.2d 571, 573 (1983) (quoting *State v. Coolidge*, 106 N.H. 186, 191, 208 A.2d 322, 326 (1965), *rev'd on other grounds sub nom. Coolidge v. New Hampshire*, 403 U.S. 443, *reh'g denied*, 404 U.S. 874 (1971)).

 Employing a trained canine to sniff a person's private vehicle in order to determine whether controlled substances are concealed inside is certainly a search in these terms. The drug detection dog discerned something not otherwise apparent to the officers through their own senses, aided or unaided, and advised them of what the dog had discovered by means the officers could perceive. The very purpose of bringing the dog to the vehicle was to have it detect any contraband that might be hidden inside. The sniff, in short, was a prying by officers into the contents of Pellicci's possession, which, concealed as they were from public view, could not have been evident to the officers before the prying began. *See McGann supra.* However limited the information it provided, I believe that it is proper to categorize this dog sniff as a search, and it was therefore subject to the strictures of part I, article 19. I note that nearly all of the commentators have also categorized a dog sniff as a search. 1 W. LaFave, Search and Seizure § 2.2(f), at 366 n.189, 367 n.202 (2d ed. 1987).

The fact that the sniff was a search, however, does not determine whether or not it was reasonable under the circumstances. As already noted, a canine sniff differs from the traditional search in that it discloses only limited information and likely entails less embarrassment or inconvenience. Other courts and commentators who agree that a canine sniff is indeed a search have further held that its limited nature justifies its employment, under appropriate circumstances, on the basis of a "reasonable" or "founded" suspicion rather than probable cause. *See, e.g., Commonwealth v. Johnston*, 530 A.2d 74, 79–80 (Pa. 1987) (decided under Pennsylvania Constitution); *Pooley v. State*, 705 P.2d 1293, 1310–11 (Alaska App. 1985) (decided under Alaska Constitution); *United States v. Place*, 462 U.S. 696, 723 (Blackmun, J., concurring) (suggesting *Terry* standard might appropriately be applied to canine sniffs). LaFave, in his treatise on search and seizure, states:

"In *Terry v. Ohio*, the Court upheld a limited warrantless search made upon less than probable cause 'by balancing the need to search [or seize] against the invasion which the search [or seizure] entails,' and thus a similar approach might be taken as to the kind of search [dog sniff] here under discussion. Although there are sound reasons for not employing too generously 'a graduated model of the fourth amendment,' the notion that searches by use of dogs trained to detect narcotics or explosives is a lesser intrusion subject to lesser Fourth Amendment restrictions is sound. This is because this particular investigative technique is a distinct police practice which quite obviously is much less intrusive than other searches."

1 W. LaFave, *supra* at 375.

 The LaFave analysis comports with our own recognition that, because of the limited intrusion involved, officers may effect an investigative stop, consistent with part I, article 19, on the basis of a reasonable and articulable suspicion of imminent criminal activity, provided the intrusion on protected interests is sufficiently small and the legitimate State interest sufficiently great. The specific circumstances surrounding the canine sniff in this case likewise warrant application of the reasonable suspicion standard. Here, officers made an otherwise permissible investigatory stop of Pellicci's vehicle based on a reasonable and articulable suspicion that it contained controlled substances which he was en route to sell. During this stop, officers effected a brief canine sniff of the vehicle based on the further reasonable and articulable suspicion that it contained controlled substances. This sniff apparently lasted no longer than the questioning that was permissible and involved no seizure of property other than the one necessarily accompanying the stop. Under these circumstances, the intrusion on protected interests, which disclosed only the presence or absence of controlled substances, was sufficiently limited, and the legitimate State interest sufficiently great, to justify the search on the basis of less than probable cause.

 I would therefore hold that where, as here, a canine sniff: (1) is part of an investigative stop based on a reasonable and articulable suspicion of imminent criminal activity involving controlled substances; (2) is employed to search a vehicle; (3) in no way increases the time necessary for the moderate questioning our prior cases allow; and (4) is itself based on a reasonable and articulable suspicion

that the property searched contains controlled substances, it satisfies the requirements of part I, article 19.

I note that the difficulty in deciding whether a dog sniff falls within federal or State constitutional protections against unreasonable searches was presaged by the case of *United States v. Beale* before the Ninth Circuit Court of Appeals. In *Beale I*, a unanimous court held that a dog sniff of a person's luggage to detect drugs *"is* a Fourth Amendment intrusion, albeit a limited one that may be conducted without a warrant and which may be based on an officer's 'founded' or 'articulable' suspicion rather than probable cause." *United States v. Beale*, 674 F.2d 1327, 1335 (9th Cir. 1982) (emphasis in original). The case was appealed; *Place* was shortly thereafter decided. The United States Supreme Court then vacated the circuit court decision and directed "further consideration" of the issue in light of *Place. United States v. Beale*, 463 U.S. 1202 (1983), *granting cert. and vacating United States v. Beale*, 674 F.2d 1327 (9th Cir. 1982).

In *Beale II, United States v. Beale*, 731 F.2d 590 (9th Cir. 1983), the court considered the *Place* language that a dog sniff of luggage "did not constitute a 'search' within the meaning of the Fourth Amendment." *United States v. Place*, 462 U.S. 696, 707. The circuit court majority concluded, after considering what it called the dicta of *Place, Beale II*, 731 F.2d at 593, that it would "adhere to our position in *Beale I* in the belief that it presents a coherent framework for judicial oversight of canine investigations," *id.* at 595, and again called upon the district court to determine if *"some articulable reason,* not necessarily amounting to probable cause" existed for suspecting the luggage may contain contraband. *Id.* at 596 (emphasis in original). The circuit court thereafter granted rehearing *en banc* and withdrew its decision in *Beale II. United States v. Beale*, 728 F.2d 411 (9th Cir. 1984).

In *Beale III, United States v. Beale*, 736 F.2d 1289 (9th Cir.), *cert. denied*, 469 U.S. 1072 (1984), the majority finally followed *Place* and held that a dog sniff did not constitute a "search" within the meaning of the fourth amendment. However, Judge Pregerson, in dissent, stated, "I write further mainly to point out that the majority, in telling us that a dog sniff is not a *search*, fails to tell us what it *is.*" *Id.* at 1292 (emphasis in original). Judge Pregerson then went on to say:

> "When using dogs to ferret out contraband, the police are
> not simply walking around hoping to come across evidence
> of a crime. Instead they are investigating. They are trying

to find something. They are seeking evidence in hidden places. If this activity does not qualify as a 'search,' then I am not sure what does."

Other federal courts after *Place*, however, did not adopt wholesale the proposition that a dog sniff is not a search. "It is one thing to say that a sniff in an airport is not a search, but quite another to say that a sniff can *never* be a search. The question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy." *United States v. Thomas*, 757 F.2d 1359, 1366 (2d Cir. 1985) (emphasis in the original). *Thomas* held that a dog sniff of the *outside* of a person's home was an impermissible search without a warrant since "it remains a way of detecting the contents of a private, enclosed space." *Id.* at 1367.

In *United States v. Whitehead*, 849 F.2d 849 (4th Cir. 1988), the court held that bringing a dog into a train roomette to smell the interior was permissible even though there was some fourth amendment activity involved, because the defendant had less expectation of privacy in his roomette than he would have had in his home or a motel room. *Id.* at 855. However, the court stated, *"Place* obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts." *Id.* at 857. The court further agreed with the district court that *reasonable suspicion* was necessary before the search could be conducted. *Id.* at 858.

Finally, in *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), where a trained dog jumped into the defendant's vehicle prior to alerting on drugs, the court found "the dog's instinctive action [leaping into the vehicle through an open hatchback] did not violate the Fourth Amendment" because there was no evidence the police asked the defendant to open the hatchback. *Id.* at 364. The court stated that the "police may employ a narcotics dog to sniff an automobile which they have stopped upon *reasonable suspicion* to believe it contains narcotics." *Id.* at 363 (emphasis added). The review of the above cases indicates that there is good reason to believe that we have not heard the last word on whether a dog sniff is a search under the fourth amendment.

The holding I set forth above would require that the authorities be able to articulate a reasonable suspicion of criminal activity, albeit after the fact, to employ a dog to sniff for contraband. If this court were to demand less, we would abdicate our responsibility for judicial scrutiny of searches under our State Constitution.

■ ■ The final question at issue is whether the State introduced evidence of the drug detection dog's reliability sufficient to establish that its alert gave officers probable cause to search Pellicci's person. Pellicci emphasizes that the State never introduced evidence as to the dog's breed or the breed's ability to detect controlled substances. Admittedly, evidence of a dog's ability to track suspects is necessary before tracking evidence may be admitted at trial to prove guilt. *Cf. State v. Taylor,* 118 N.H. 855, 857, 395 A.2d 505, 506 (1978). However, even if evidence fails the reliability test for admissibility to prove guilt at trial, a court may still give it weight in determining whether officers had probable cause to arrest or search. *Maya,* 126 N.H. at 598–99, 493 A.2d at 1146. Because it is unapparent how the fact of the alert could have borne on the issue of guilt in this case, I consider below only whether the evidence of reliability the State did provide was sufficient to allow the trial court to give weight to the alert in determining probable cause.

■ At the combined hearing and trial, the State introduced evidence that: (1) Patrolman Ronchi and the drug detection dog had completed a six-month training program of building, vehicle, and open field searches; (2) the dog had been trained to detect cocaine, marijuana, hashish, crack and heroin; (3) the dog had a 95% success rate in detecting such substances in vehicles; (4) when the dog indicated the presence of controlled substances in a vehicle, "his ears would perk up and go straight forward and [he] would also start pushing his nose [into the vehicle]"; (5) the dog alerted Patrolman Ronchi twice in this manner to the possible presence of controlled substances in Pellicci's vehicle. Contrary to Pellicci's further contention, there was no evidence that the dog was ever directed to sniff his person. Thus the trial court could have found that it was unreasonable to conclude anything about the dog's reliability from its failure to alert Patrolman Ronchi to the presence of the drugs later found on Pellicci.

Taken together, the above facts established the dog's reliability sufficiently for the trial court to give its alert weight in determining whether the officers had probable cause to believe that the vehicle contained contraband. While I agree with Pellicci that a reliable alert to his vehicle would not necessarily help to establish probable cause to search his person, I believe that the search in this case was incident to his arrest, and therefore permissible.

■ ■ Considered in combination with the evidence that justified the stop in the first place, the dog's alert clearly established

probable cause for Pellicci's arrest. "Probable cause to arrest exists when the arresting officer has knowledge and trustworthy information sufficient to warrant a person of reasonable caution and prudence in believing that the arrestee has committed an offense. *State v. Vachon*, 130 N.H. 37, 40, 533 A.2d 384, 386 (1987). At the time they searched him, officers possessed evidence that Pellicci had just embarked, with a passenger, on a route he regularly took from the Club Excalibur to one of two nearby parking lots to make controlled substance sales to fellow club patrons. They also had evidence that his car contained such substances. All of this evidence taken together would justify a person of ordinary caution in the belief that Pellicci possessed such substances and was transporting them to a spot where he intended to sell them. The fact that the search immediately preceded the arrest rather than following it is of no consequence since probable cause for the arrest was established independently of the results of the search. "Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980). *See State v. DeGrenier*, 128 N.H. 547, 549, 517 A.2d 814, 816 (1986).

*Affirmed.*

HORTON, J., did not sit; BROCK, C.J., and THAYER, J., concurred specially; BATCHELDER, J., dissented.

BROCK, C.J., concurring specially: I agree with Justice Johnson that the detention of Pellicci was a valid investigative stop. I also agree that, under the circumstances, the police were justified in employing the trained canine to sniff for drugs hidden within his vehicle. I write only to support Justice Johnson's opinion, although my reasoning may differ slightly, that the dog sniff during the investigative stop was a limited search of State constitutional dimension which, in the absence of a warrant, was properly founded upon a reasonable suspicion that the vehicle contained contraband.

The defendant has asked us to hold that the dog sniff was a search requiring prerequisite probable cause. He bases his claim upon part I, article 19 of our State Constitution, which reads as follows:

> "Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions. Therefore, all warrants to

search suspected places, or arrest a person for examination or trial in prosecutions for criminal matters, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order, in a warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure; and no warrant ought to be issued; but in cases, and with the formalities, prescribed by law."

It is clearly recognized that the scope of protection afforded individuals by provisions of the New Hampshire Constitution may differ from that afforded by similar provisions found in the United States Constitution. *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350–51 (1983). But, while they are not necessarily identical in scope, it is logical, given their common ancestry, that the fourth amendment and part I, article 19 would be subject to parallel interpretations. Part I, article 19 was preceded by, and virtually duplicated, the wording found in article XIV of the Massachusetts Declaration of Rights. J. LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT 38 (1966) (hereinafter cited as LANDYNSKI). This same wording served as the apparent model for the fourth amendment. *Id.* at 38–39. It is well recognized that search and seizure provisions, such as the fourth amendment and part I, article 19, were conceived in response to the use of general warrants and, in particular, the employment of writs of assistance in the Colonies prior to the American Revolution, a practice which caused profound resentment among the colonists. *See id.* at 30–39; *Warden v. Hayden*, 387 U.S. 294, 301 (1967); *United States v. Verdugo-Urquidez*, 110 S.Ct. 1056, 1061, *reh'g denied*, 110 S.Ct. 1839 (1990); *State v. Tucker*, 133 N.H. 204, 206, 575 A.2d 810, 812 (1990). The colonists were offended by the use of arbitrary authority to search areas over which they had personal dominion, even though the objective was to discover smuggled goods. *See Boyd v. United States*, 116 U.S. 616, 624–29 (1886). Apparently recognizing that searches are sometimes required, constitutional framers sought to afford citizens freedom from arbitrary governmental intrusions by limiting the search power of their new government. *See* LANDYNSKI, at 38–42.

The fourth amendment has been said to have "both the virtue of brevity and the vice of ambiguity." LANDYNSKI, at 42. Like part I, article 19, it has two clauses, one securing the right against unrea-

sonable searches and the second specifying the conditions under which a warrant may be issued. The relationship intended by the authors between the two clauses is not clearly expressed and is not exactly known. *Id.*

From an historical perspective, the most faithful interpretation of the fourth amendment and part I, article 19 would require that there be a formal warrant for any search to be reasonable. LANDYNSKI, at 42–43. Therefore, *all* warrantless searches would be *per se* unreasonable. That may have been the framers' original intent, but this court has not adhered to such a strict interpretation of search and seizure provisions. Instead, like the fourth amendment, part I, article 19 has been extended to deal with exigent circumstances by creating limited exceptions to the warrant requirement. *See State v. Camargo*, 126 N.H. 766, 770–71, 498 A.2d 292, 295 (1985). All warrantless searches remain *per se* unreasonable unless they come within one of these few exceptions. *State v. Theodosopoulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), *cert. denied*, 446 U.S. 983 (1980). These include the exigent circumstances exception, *see State v. Mac-Donald*, 129 N.H. 13, 20, 523 A.2d 35, 39 (1986), the plain view exception, *see State v. Maguire*, 129 N.H. 165, 169, 523 A.2d 120, 123 (1987), the search incident to arrest exception, *see State v. Maxfield*, 121 N.H. 103, 105, 427 A.2d 12, 14 (1981), the inventory search exception, *see State v. Farnsworth*, 126 N.H. 656, 661–62, 497 A.2d 835, 838 (1985), and the automobile exception, *see State v. Gallant*, 133 N.H. 138, 145, 574 A.2d 385, 390 (1990). Although each of the above exceptions negates the need for a prerequisite search warrant, the State must still satisfy the warrant clause by showing that its actions were supported by probable cause.

Thus, we come to understand both the purpose and the mechanics of the fourth amendment and part I, article 19. These provisions are intended to protect individuals from arbitrary governmental intrusions. When engaging in an investigatory procedure which constitutes a "search" within the meaning of these provisions, government officials must obtain a warrant or be prepared to demonstrate that their actions were justified by certain exceptional circumstances and were founded upon probable cause.

Having described this historical backdrop, my analysis begins with a review of the opinion of the United States Supreme Court in *United States v. Place*, 462 U.S. 696 (1983). In *Place*, drug enforcement agents made an investigative stop of a suspect at La Guardia Airport. *Id.* at 698–99. In the course of the stop, the suspect's lug-

gage was seized without a warrant and was transported to Kennedy Airport, where it was subjected to a canine "sniff test." *Id.* at 699. The Court held that the initial detention was justified but that the prolonged seizure of the luggage, over ninety minutes, exceeded the limits of a mere investigative stop and was unreasonable in the absence of probable cause. *Id.* at 709–10.

In its opinion, the majority of the *Place* Court, in three paragraphs, briefly addressed the dog sniff. *Place*, at 706-07. The Court began its discussion by stating that "if [the dog sniff] is itself a search requiring probable cause, the initial seizure of respondent's luggage for the purpose of subjecting it to the sniff test—no matter how brief—could not be justified on less than probable cause." *Id.* at 706. It then discussed the characteristics of a canine sniff, emphasizing that the "technique is much less intrusive than a typical search" and that the property owner "is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *Id.* at 707. In conclusion, the Court held "that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." *Id.*

It is important to note that the *Place* majority used the qualifying phrase "within the meaning of the Fourth Amendment." *Place*, at 707. Our common understanding of the meaning of the word "search" may be quite different from its meaning in constitutional context. The discussion in *Place* did not preclude consideration of the dog sniff as a "search" in plain terms, it simply supported the Court's characterization of the dog sniff as *sui generis* and its treatment accordingly. *See id.*

It is the *Place* holding which serves as the centerpiece of the State's response to Pellicci's claim. The State asserts that *Place* stands for the proposition that the use of drug detection dogs is not subject to the proscriptions of the fourth amendment. The State would have us simply adopt this conclusion in interpreting part I, article 19.

It is appropriate at this point to comment upon a type of governmental intrusion, as originally set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), which is a "search," but which does not fall within the traditional mechanics of the fourth amendment or part I, article 19. There is "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—

which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.* at 20. This conduct includes a pat down for weapons during an investigatory detention. *Id.* A "frisk" is unique because the scope of discovery is strictly limited and the intrusion on personal security, although severe, is brief. *See id.* at 24–25. It is not a "full" search, *id.* at 26, and falls within a category of search which simply does not rise to the threshold level necessary to invoke the warrant clause of the fourth amendment, *id.* at 20. Yet, this conduct touches the basic notions at the heart of constitutional search and seizure provisions, the public interest in effective crime prevention and detection and the right of individuals to be free of arbitrary governmental intrusions. *Id.* at 20–21. Therefore, the constitutionality of such conduct is tested by applying only the first clause of the fourth amendment, the general proscription against unreasonable searches and seizures. *Id.* at 20.

This court has adopted the reasoning of *Terry* in interpreting part I, article 19 and has recognized that a limited search may be conducted following an investigative stop without a warrant or probable cause. *State v. Hamel,* 123 N.H. 670, 674–76, 466 A.2d 555, 558 (1983); *see* RSA 594:3. Upon a reasonable suspicion that the person detained may be carrying a weapon, an officer may frisk the suspect. *State v. Hamel,* 123 N.H. at 676, 466 A.2d at 558. The reasonableness of this limited intrusion into an area ordinarily subject to constitutional protection is determined by balancing "the public interest in law enforcement and the individual's right to personal security free from arbitrary action by law officers." *State v. Landry,* 116 N.H. 288, 289–90, 358 A.2d 661, 663 (1976) (citing *Terry v. Ohio,* 392 U.S. at 20–21). Applying this balancing test, we have concluded that the safety of police officers outweighs the limited intrusion caused by a momentary pat-down search. No warrant or probable cause is necessary. Only a reasonable suspicion that the suspect "may be armed and presently dangerous" must be shown. *See State v. Hamel,* 123 N.H. at 675, 466 A.2d at 557 (quoting *Terry v. Ohio,* 392 U.S. at 30); RSA 594:3. Thus, in interpreting the constitutionality of the frisk, this court has given practical consideration to its unique character and, while continuing to honor the purpose of part I, article 19, has not applied the dichotomous mechanical approach which existed prior to *Terry.*

It is my opinion that the use of a canine sniff during an investigative detention is similar in character to a frisk and should be placed within the same category. I fully recognize and accept the fact that

this opinion represents an extension of the *Terry* doctrine beyond a search for weapons. But, a canine sniff is, as the *Place* majority pointed out, *sui generis.* Like a frisk, it is uniquely limited in both discovery and intrusiveness and it does not rise to a level necessary to trigger the warrant requirement. Yet, it is a search within the plain meaning of the word. To have one's person or possession "sniffed" by a dog is certainly an affront to personal dignity, and the fact that discovery is limited does not make it any less so. It most certainly can "be an annoying, frightening, and perhaps humiliating experience." *See Terry* at 25. Although not a full-blown search, I believe that the use of a dog by police to discover concealed items is an intrusion which can inflict indignity and cause resentment of the type sought to be precluded by part I, article 19. Therefore, as in the case of a frisk, it is my opinion that the *Terry* balancing test should be applied in determining the reasonableness of the canine sniff.

In weighing the competing interests, a comparison between a frisk and a canine sniff may be helpful. The discovery of contraband generally, although important, certainly does not carry the weight given the immediate safety of a police officer. Similarly, however, the intrusiveness of a dog sniff does not compare in severity to the physical frisking of a person. *See Terry v. Ohio*, 392 U.S. at 16–17. I believe that use of a canine sniff during a lawful investigative stop, founded on a reasonable and articulable suspicion that the object of the sniff contains contraband, does satisfy the *Terry* balancing test.

The *Place* majority held that the dog sniff was not a "'search' within the meaning of the Fourth Amendment." *See Place*, 462 U.S. at 707. To hold otherwise would (as Justice Batchelder properly points out in his dissent) require that police have probable cause before employing a narcotics detection dog, unless a *Terry*-type analysis was applied. Admittedly, there is no indication that the *Place* majority either considered or relied upon *Terry* in finding that the drug enforcement agents were justified in employing the canine sniff. But, in *Place* the dog was used during an investigative detention and the officers had a reasonable suspicion that the object to be searched contained drugs. I note that had *Terry* been applied, the result would have been in harmony with the conclusion drawn in *Place*, that "the particular course of investigation that the agents intended to pursue" was constitutionally justified. *See Place*, 462 U.S. at 707.

In ruling upon Pellicci's claim, I would hold that the dog sniff was a limited search within the meaning of part I, article 19. I am in agree-

ment with Justice Johnson that, when police have made a valid investigative stop or detention, they may employ such "sniffs" provided that they have a reasonable and articulable suspicion that the object to be sniffed contains contraband. I would also note that, like a frisk, the use of a trained narcotics dog could require probable cause to be reasonable in a setting outside the scope of a lawful limited investigative detention.

To say that dog sniffs are completely removed from the protections afforded by part I, article 19 would allow their arbitrary employment by law enforcement officials. An innocent person standing on a sidewalk could be subjected to the embarrassment and indignity of a dog sniff at the discretion of police. Similarly, a person stopped for a minor traffic offense, while in view of passing neighbors or friends, could have his vehicle sniffed without any basis for suspecting that it contains contraband. I believe that these governmental intrusions are of a quality that offended our ancestors and precipitated the protections afforded in part I, article 19.

But, to define a canine sniff as a "full search" within the meaning of part I, article 19 would require probable cause every time the police seek to use a drug detection dog. The role of such animals would be effectively limited to ascertaining the location of contraband, as opposed to discovering its existence. Canine narcotics sniffs would be of little practical benefit to law enforcement officials.

I find neither of the above extreme positions satisfactory. There should be no war between our constitution and common sense. *State v. Crump*, 107 N.H. 62, 64, 217 A.2d 183, 185 (1966) (quoting *Mapp v. Ohio*, 367 U.S. 643, 657 (1961)). Dog sniffs should be considered in the same category as frisks and be subject to the *Terry* balancing test. Such treatment would show our continued reverence for the values which gave life to part I, article 19, while acknowledging, as did the United States Supreme Court in *Place*, the unique character of the dog sniff.

THAYER, J., concurring specially: I agree with my brothers Brock and Johnson in their holding that the conviction should be upheld. I also agree with them that upon the facts presented a valid *Terry* stop was effected, and that the State introduced evidence of the drug detection dog's reliability sufficient to establish that its alert gave the officers probable cause to search Pellicci. I disagree with my colleagues, however, that the dog sniff conducted here was a search within the meaning of part I, article 19.

In determining whether an officer using a police dog trained to detect narcotics has engaged in a search within the meaning of our State Constitution, when the dog engages in a physically unintrusive sniffing of a car, we must first look to prior cases of this court, in an effort to determine the meaning of the term search. In *State v. McGann*, 124 N.H. 101, 467 A.2d 571 (1983), we stated that "[a] search ordinarily implies, a quest by an officer of the law, a prying into hidden places for that which is concealed." *Id.* at 104, 467 A.2d at 573 (quoting *State v. Coolidge*, 106 N.H. 186, 191, 208 A.2d 322, 326 (1965)). The relevant facts in *McGann* were that a law enforcement officer was seeking an automobile's vehicle identification number (VIN) that was not in plain view. *Id.* at 103, 467 A.2d at 572. In response to the officer's attempt to obtain the number, the owner of the vehicle, who had not consented to a search, opened the car door so the officer could gain access to and inspect the door post for the presence or absence of a VIN. *Id.* We held in that case that the opening of the door was a prying into a hidden place for that which was concealed, and therefore constituted a search. *Id.* at 104, 467 A.2d at 573. In *Coolidge*, the police officers were looking for guns that were concealed in a bedroom closet. *State v. Coolidge*, 106 N.H. at 191, 208 A.2d at 326. Because the guns were voluntarily handed over to the officers, we held that there was no prying into, and therefore no search. *Id.* at 192, 208 A.2d at 327.

In the present case, unlike the situation in *McGann*, there was no physical prying. Instead, both the officers and the dog remained lawfully outside of Pellicci's car and directed nothing inside it. To equate the opening of a car door, to make available for inspection that which is contained therein, with the analyzing by a trained narcotics dog of the air surrounding a car, without a physical intrusion into it, simply because the conduct in both circumstances led to a determination of what was contained in the protected area, completely ignores the legal necessity of a physical intrusion. Justice Johnson stresses the factual distinction between an officer's ability through his or her own senses to detect possible unlawful activity, and the use of other devices, mechanical or otherwise, as a factor in determining whether or not particular conduct constitutes a search. It is clear that no search occurs when an individual uses his or her own senses to detect illegal conduct. *See United States v. Martinez-Miramontes*, 494 F.2d 808, 810 (9th Cir.), *cert. denied*, 419 U.S. 897 (1974) (no search where officer smells marijuana odor emanating from vehicle); *United States v. Fisch*, 474 F.2d 1071, 1076–79 (9th Cir.), *cert. denied*, 412 U.S. 921

(1973) (officers overhearing incriminating conversation taking place in neighboring hotel room not conducting search in absence of trespass). It is equally clear, however, that the use of technology to enhance an officer's senses does not necessarily transform otherwise lawful conduct into a search for constitutional purposes. *See United States v. Knotts*, 460 U.S. 276, 282 (1983) (fourth amendment does not prohibit police from augmenting senses with science and technology); *Dow Chemical Co. v. United States*, 476 U.S. 227, 238–39 (1986) (no fourth amendment search where government utilizes camera to provide more detailed information than naked eye can see); *United States v. Knotts*, 460 U.S. at 285 (police use of radio receiver to track radio transmitter located within defendant's car does not constitute search).

The historical backdrop of part I, article 19 and the fourth amendment, as well as federal cases interpreting the fourth amendment, are helpful in analyzing the issue before us. As Chief Justice Brock points out, part I, article 19 and the fourth amendment were conceived to restrain the excesses of British rule. The British, under the authority of general writs of assistance, would search the property of colonists in an attempt to find goods being smuggled into the colonies that had not had taxes paid on them. Additionally, British troops would intrude into private homes and businesses in an attempt to determine whether anyone was printing material without first having obtained a license from the British government. In these cases, the British were searching, *i.e.*, physically prying into, carts, houses, offices, etc.

Similarly to this court's requirement that there be a physical prying for conduct to constitute a search, federal courts interpreting the Federal Constitution held, until 1967, that the absence of any trespass, *i.e.*, physical intrusion, would result in the conduct's falling outside the fourth amendment prohibition. *See Silverman v. United States*, 365 U.S. 505, 509–11 (1961); *Olmstead v. United States*, 277 U.S. 438, 457, 464, 466 (1928). However, in *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court of the United States broadened the definition of search by stating that "the Fourth Amendment protects people—and not simply 'areas'—against unreasonable searches and seizures . . . [so that] the reach of that Amendment cannot turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* at 353. So was born the reasonable expectation of privacy concept in determining fourth amendment rights.

The reasonable expectation of privacy concept enunciated in *Katz* has never been adopted by this court, and the parties did not argue that we adopt it here. We recently addressed the application to our State Constitution of the legitimate expectation of privacy analysis, when we said:

"Indeed, so far as we are aware, this court has never been asked to construe article 19 by choosing from among the possibilities ranging from the holding of the *Katz* majority, through other generalized principles of privacy, to the position taken by Justice Black, who dissented in *Katz*. Nor do the parties address these interpretive alternatives here, where neither side has briefed the background of article 19 and the history of its application as bearing on the extent to which *Katz* may be a sound guide to our own constitution."

*State v. Valenzuela*, 130 N.H. 175, 180–81, 536 A.2d 1252, 1256 (1987), *cert. denied*, 485 U.S. 1008 (1988) (citations omitted). Furthermore, the wisdom of adopting the *Katz* analysis when interpreting part I, article 19 was questioned in *State v. Settle*, 122 N.H. 214, 219, 447 A.2d 1284, 1287 (1982), where we stated:

"The 'legitimate expectation of privacy' doctrine is no boon to the general administration of the criminal justice system, the law enforcement establishment, the workload of the trial courts, or clearly defined constitutional rights. It introduces into the law enforcement and judicial process yet another flexible threshold determination to be made for the orderly and fair disposition of criminal cases. . . . Our review of the cases decided under the 'legitimate expectation of privacy' doctrine shows us that its administration is not without problems. Appellate courts have been forced to draw fine distinctions whose logical bases are questionable."

It is clear that until we are asked to broaden the concept of search that has traditionally been used by our State, the test to be applied mandates inquiry into whether a physical intrusion or trespass has occurred. Accordingly, I would hold that when, as here, a police dog engages in conduct that does not physically intrude into the property of a defendant, no violation of part I, article 19 has occurred.

I cannot help but note that our traditional definition of "search," which requires that there be a physical intrusion, or the as yet undefined concept resulting from my brothers' opinions, which in any event falls short of *Katz*, is more restrictive than its federal counter-

part. However, the Supreme Court of the United States has determined that a dog sniff in a public place does not rise to the level of a search, while the majority here, applying the more narrowly drawn definition of search, holds that it does. In *United States v. Place*, 462 U.S. 696 (1983), the Supreme Court considered whether a dog sniff of an individual's luggage constituted a search under the fourth amendment to the Federal Constitution. *Id.* at 706–07. In holding that it did not, the Court explained:

> "A 'canine sniff' by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment."

*Id.* at 707. My objection, then, to the majority's view that a nonintrusive dog sniff in a public place is a search centers around the fact that our State Constitution requires that there be a physical intrusion, an element not present here, and also that the United States Supreme Court, which has broadened the term "search" for federal constitutional purposes, has not found a dog sniff under these circumstances to be a search.

My brothers Brock and Johnson hold that although a dog sniff is a search, our State Constitution does not require that such sniffs be

supported by probable cause. Instead, they write that the *Terry* balancing test extends to dog sniffs of a vehicle for controlled substances so that an officer's reasonable suspicion that such contraband is concealed in the vehicle is enough to substantiate the search. My brothers refer to no New Hampshire or federal case law, however, that supports the application of *Terry* to an immediate search of the person or vehicle stopped, when the *Terry* stop results in no information or evidence furnishing probable cause for the further search. In order to justify their result, Justice Johnson and Chief Justice Brock have had to interpret *Terry v. Ohio*, 392 U.S. 1 (1968), in a way never contemplated by the federal courts. The United States Supreme Court has consistently held that when a stop and search of a vehicle is effected under *Terry*, a search of that vehicle can occur only if the law enforcement authorities have probable cause. If no probable cause exists, the evidence seized must be suppressed. *United States v. Ross*, 456 U.S. 798, 809 (1982); *Carroll v. United States*, 267 U.S. 132, 153–54 (1925).

It is important to note that the basis for the limited search, or frisk, in *Terry* was the safety of the police officer and the public. *Terry v. Ohio*, 392 U.S. at 23. The purpose of the *Terry* frisk is completely unrelated to any underlying crime which the officer may reasonably believe the individual is committing, has committed, or is about to commit. In expanding *Terry* to apply to the dog sniff of a vehicle based on officers' reasonable suspicion of criminal activity involving drugs, Justice Johnson and Chief Justice Brock have misconstrued the purpose of the limited search enunciated in *Terry*. Under their theory, for which no legal basis has been cited, the governmental interest in conducting a limited search will vary, depending on the severity of the crime being investigated, a concept which is at odds with the underlying rationale of *Terry*.

BATCHELDER, J., dissenting: I agree with Justice Johnson and Chief Justice Brock that the canine sniff at issue here was a search within the meaning of part I, article 19 of the New Hampshire Constitution. Because I do not consider the dog sniff itself to fall within the limits of a *Terry*-type search, I write in dissent. I would hold that the search carried out through the use of the dog, like most other searches, required probable cause, and not merely a reasonable and articulable suspicion that the defendant was engaged in, or about to commit, some type of criminal activity involving controlled substances and that his vehicle contained illicit drugs.

As the basis of their treatment of the canine sniff, Justice Johnson and the Chief Justice adopt the reasoning of *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). They would have the court espouse today, as State constitutional law, the position that a *Terry*-type investigation can be carried out to search for illicit drugs. I appreciate that in taking such a position they attempt to limit, under the State Constitution, the use of canine sniff investigations. I take issue, however, with the analysis upon which they rely in this case.

I recognize that an argument can be made that under *United States v. Place*, 462 U.S. 696, 706–07 (1983), a dog sniff such as the one here is not a search for the purposes of the fourth amendment to the Federal Constitution; however, I am also aware that this canine sniff would not meet the limits of a federal *Terry* analysis.

As Justice Johnson states, "[T]he very purpose of bringing the dog to the vehicle was to have it detect any contraband that might be hidden inside." A canine trained to detect illicit drugs does not preliminarily question a suspect to allay or confirm its reasonable suspicion of criminality. It simply searches for evidence of crime. In this regard, use of a trained canine to detect drugs goes beyond the narrow confines of a *Terry*-type search.

Although the *Terry* balancing test has been applied to allow an officer to conduct, on the basis of less than probable cause, a warrantless seizure and pat-down search of a suspect for weapons, *Terry, supra* at 30, and has been relied upon in support of further limited investigative seizures under the fourth amendment, *see, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (investigative seizure of vehicle), I know of no decision of the United States Supreme Court that, under the reasoning of *Terry*, allows an officer to conduct a search for evidence based only upon a reasonable and articulable suspicion of criminal activity. *See, e.g., Brignoni-Ponce*, 422 U.S. at 881–82 ("The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause."). *Terry* itself anticipates and rejects the expansion of its reasoning to encompass Justice Johnson's and Chief Justice Brock's proposed search:

> "We need not develop at length in this case . . . the limitations which the Fourth Amendment places upon a protective seizure and search for weapons . . . . Suffice it to note that such a search, unlike a search without a warrant incident to

a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime."

*Terry, supra* at 29.

Justice Johnson quotes *United States v. Whitehead*, 849 F.2d 849, 856 (4th Cir.), *cert. denied,* 109 S. Ct. 534–35 (1988), to say that *Terry*'s reasoning has been expanded beyond the "stop and frisk" situation present in *Terry*, as support for his novel application of the *Terry* balancing test to the case before us. However, the cases *Whitehead* relied upon for that statement all involved seizures under the fourth amendment rather than searches. *See United States v. Sharpe,* 470 U.S. 675, 673 (1985) (20-minute investigative detention of defendant); *United States v. Place,* 462 U.S. at 699 (temporary warrantless detention of luggage at public airport); *Michigan v. Summers,* 452 U.S. 692, 693 (1981) (seizure of person on outside steps of home); *United States v. Brignoni-Ponce,* 422 U.S. at 875 (roving border patrol stopping vehicle to question occupants).

Moreover, to the extent the *Whitehead* court itself applied a *Terry* balancing standard to uphold the canine sniff search it was concerned with, it is unclear to what degree it utilized *Terry* in examining the dog sniff *per se,* as opposed to other circumstances present in the case. In *Whitehead*, police officers brought trained narcotic-sniffing dogs into the defendant's roomette on a train to sniff his luggage while he waited outside. *Whitehead, supra* at 853. The court apparently relied upon *Terry* in concluding that the dog sniff did not require probable cause. *Whitehead, supra* at 856. However, the court factored into the balance the limited expectation of privacy that *Whitehead* reasonably had in the roomette, as well as the level of intrusiveness of the dog sniff and the gravity of the law enforcement interest supporting the dog sniff. *Whitehead, supra* at 856. To the extent the court considered *Whitehead*'s reasonable expectation of privacy in the roomette, it is unclear whether its holding under *Terry* applied to the canine sniff alone or to the officers' entrance into the roomette under the circumstances present. Because *Whitehead* was based upon an expectation of privacy analysis which, as Justice Johnson and Justice Thayer acknowledge, we have neither adopted nor rejected under part I, article 19, and because its application of *Terry* to the dog sniff is unclear, Justice Johnson relies upon a slender reed indeed in applying his novel extension of *Terry* under the New Hampshire Constitution.

Even if, given the *sui generis* nature of a canine sniff, *Terry* did support such a search based upon merely a reasonable and articula-

ble suspicion, the dog sniff in this case took place in such a context that it went beyond *Terry*'s intended minimal intrusion on fourth amendment rights. *Cf. United States v. Place*, 462 U.S. at 703 ("When the nature and extent of the detention are *minimally intrusive* of the individual's fourth amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.") (Emphasis added.). Here, although the police arguably had probable cause to obtain a warrant, Pellicci was stopped and ordered to remain in his car, while the dog sniffed the car's exterior, on a public street. It is arguable that this activity subjected the defendant to the type of "embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods." *United States v. Place*, 462 U.S. at 707. The application of *Terry* to a search and seizure as intrusive as that in this case would create an exception that would threaten to swallow the general rule that searches under part I, article 19 are "reasonable" only if based on probable cause. *Cf. Dunaway v. New York*, 442 U.S. 200, 213 (1979).

The canine sniff at issue here should be treated either as a search requiring probable cause, or not as a search at all, as it is so considered in the concurring opinion of Justice Thayer. I consider it a search requiring the full panoply of State constitutional protections for the following reasons. The New Hampshire Constitution is protective of those within its borders. Like the Federal Constitution, some of its guarantees of liberty are necessarily weighed against the competing societal interests of freedom from government intrusion, on the one hand, and the successful prosecution of those who commit crimes, on the other. In this delicate area of balancing such interests, it is tempting to equate the contemporary concepts of guaranteed freedom under the State Constitution with those of the Federal Constitution, as expressed in decisions of the United States Supreme Court. Such an approach, in my view, contains within itself a flaw. The million or so persons within New Hampshire's borders at any given time are not necessarily a microcosm of the national population as a whole. To the extent that the framers contemplated a function by the States as laboratories for the nation, they recognized a distinction between the social fabric of a State and the larger social fabric of the nation. I believe that a strong argument can be made that the societal interests weighed by the United States Supreme Court in its interpretation of the Federal Constitution are not at all times concomitant with those considered by us at the State level.

Interpretations of the Federal Constitution must be reflective of deep concerns for the protection of life and property at society's fringes. The lowest common denominator of America's social ills, for better or worse, has a role in constitutional interpretations. In decisions such as *United States v. Place*, 462 U.S. 696, the Court was necessarily concerned with drug running in high-volume airports and indirectly by reference to the wholesale smuggling of aliens at the Mexican border, as well as with the potentiality for the delivery of bombs or explosive devices to departing flights at the nation's airports. This is a different backdrop than the case at hand, in which Pellicci, albeit the target of an ongoing drug surveillance and investigation, was driving his car with a passenger in the early evening of an August day on a public street in Portsmouth. Holding that the canine sniff at issue here was a search within the meaning of part I, article 19, but, because of a novel extension of *Terry*-stop analysis, not one required to be based on probable cause, portends the first step into a constitutional thicket from which our extrication will be neither supportive of civil rights nor helpful to the difficult task of law enforcement.

The fourth amendment to the United States Constitution acts as a base line for an individual's right to be free from unreasonable searches and seizures. However, we have continually interpreted part I, article 19 of the New Hampshire Constitution to provide greater protection. *State v. Koppel*, 127 N.H. 286, 289, 499 A.2d 977, 979–80 (1985). In support of extending personal freedoms under State constitutions, it has been stated:

> "When weighed against the ability to protect fundamental constitutional rights, the practical need of uniformity can seldom be a decisive factor. Thus; notwithstanding an interest in conforming our State Constitution's restrictions on searches and seizures to those of the Federal Constitution where desirable, this court has adopted independent standards under the State Constitution when doing so best promotes 'predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens.'"

*People v. P.J. Video*, 68 N.Y.2d 296, 304–05, 501 N.E.2d 556, 561–62 (1986), *cert. denied*, 479 U.S. 1091 (1987) (quoting *People v. Johnson*, 66 N.Y.2d 398, 407, 488 N.E.2d 439, 445 (1985)) (further citations omitted). In light of the foregoing, I join Justice Johnson and the Chief Justice in finding that, in the circumstances of this case, the

use of a canine to sniff the exterior of an automobile is a search within the meaning of part I, article 19 of the New Hampshire Constitution; however, I would require such a search to be based upon probable cause rather than mere reasonable suspicion.

Under part I, article 19, a warrantless search, such as the one here, is *per se* unreasonable, absent a recognized exception. *State v. Settle*, 122 N.H. 214, 218, 447 A.2d 1284, 1286 (1982). As the Chief Justice notes in his concurring opinion, all recognized exceptions to the warrant requirement, apart from, of course, the *Terry* exception that has been adopted under the State Constitution, *see State v. Brodeur*, 126 N.H. 411, 415, 493 A.2d 1134, 1137–38 (1985), are either supported by probable cause or justified as the result of an arrest based upon probable cause. The trial court did not make a finding as to probable cause warranting the use of the dog. Without that necessary finding, this search is unreasonable under part I, article 19.

Requiring probable cause for the dog sniff in this case does not obviate the conclusion that a dog sniff conducted under circumstances different from those present here might not fall within that type of conduct to which the protections of part I, article 19 apply. *Cf. United States v. Place*, 462 U.S. at 707 (canine sniff of luggage located in public airport is not a search under fourth amendment). More important, however, is the consideration voiced by Justices Stewart and Brennan in a discussion concerning the fourth amendment.

> "'In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts.' We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in . . . [the] disregard of the protections afforded by the Fourth Amendment."

*Florida v. Royer*, 460 U.S. 491, 513 (1983) (Brennan, J., concurring in result) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (Stewart, J., plurality opinion), *reh'g denied*, 404 U.S. 874 (1971)) (citations omitted). This consideration is equally applicable to our discussion here of the protections provided by the New Hampshire Constitution. As the canine sniff was a search conducted in violation of part I, article 19, I would suppress the evidence found during the subsequent search of the defendant, and I would reverse the conviction.