**Jimmy Alfonso AUTRAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 869–92.

Court of Criminal Appeals of Texas, En Banc.

Sept. 21, 1994.

---

George Barron, Louis Dugas, Jr. (on appeal only), Orange, for appellant.

Stephen C. Howard, County Atty., and Gary R. Bonneaux, Asst. County Atty., Orange, Robert Huttash, State's Atty., Austin, for State.

OPINION ON APPELLANT'S PETITION
FOR DISCRETIONARY REVIEW

BAIRD, Judge.

Appellant was convicted of possession of a controlled substance, namely cocaine. Tex. Health & Safety Code Ann. § 481.115. The jury assessed punishment at twenty years confinement and a $10,000 fine. Tex.Penal Code Ann. § 12.33. The Court of Appeals affirmed. *Autran v. State*, 830 S.W.2d 807 (Tex.App.—Beaumont 1992). We granted appellant's petition for discretionary review to determine whether the Texas Constitution provides greater protection than the United States Constitution in the context of inventories. For the following reasons, we answer that question in the affirmative and reverse the judgment of the Court of Appeals.

## I.

### THE FACTS

On October 2, 1989, at approximately 1:45 a.m. Deputy David Bailey of the Orange County Sheriff's Department stopped appellant on Highway 12 in Vidor for failure to drive within a single lane. *See*, Tex.Rev.Civ. Stat.Ann. art. 6701d, § 60(a). Appellant was accompanied by his adult son. Appellant and his son stated they had been to Houston to film a professional football game for a Miami, Florida television station and tendered press passes issued by the Metro–Dade Police Department. Bailey testified the press passes had expired. Appellant also presented a Florida driver's license, displaying a Miami address, and an Illinois vehicle registration form. Appellant stated he had purchased the vehicle within the previous five months but the registration indicated appellant purchased the vehicle approximately eighteen months prior to the stop.

With appellant's permission, Bailey looked inside the vehicle but found nothing suspicious. Bailey then requested permission to look into the trunk. Appellant stated, "no problem," and opened the trunk. Inside the trunk was a large ice chest, a cardboard box, a shopping bag, and two suitcases. Bailey attempted to open the ice chest but was interrupted when appellant attempted to close the trunk. Bailey arrested appellant for failure to "drive as nearly as practical entirely within a single lane," Tex.Rev.Civ. Stat.Ann. art. 6701d, § 60(a), and appellant's son for public intoxication, Tex.Penal Code Ann. § 42.08.

Following the established policy of the Orange County Sheriff's Department, Bailey and other officers began to inventory the vehicle. Opening the ice chest, cardboard box, and shopping bag, the officers found a large sum of cash. Due to the time and location, the inventory was discontinued and appellant's vehicle was towed to the Orange County Sheriff's Department where the inventory was continued and the cash removed to a secure location. The cash was covered with a white, powdery substance subsequently determined to be cocaine. Because the initial inventory was conducted before daylight, officers inventoried the vehicle again later that morning to verify the existence and location of each item inventoried. During this final inventory officers discovered cocaine in a closed plastic key box located under the driver's seat.

Appellant moved to suppress all tangible evidence seized from the vehicle, contending the evidence was seized in violation of the Fourth Amendment of the United States Constitution and art. I, § 9 of the Texas Constitution. The trial judge denied the motion.

The Court of Appeals affirmed, holding officers may search and inventory any container found in a vehicle as a result of an inventory so long as the officers follow established departmental procedures. *Autran*, 830 S.W.2d at 812–16. Finding the Orange County Sheriff's Department inventory procedures were clearly defined and followed, the Court of Appeals held neither the Fourth Amendment nor the Texas Constitution were violated. *Id.* at 815–16.

Appellant contends the inventory of the closed containers within the trunk and the plastic key box within the passenger compartment of his vehicle were prohibited under art. I, § 9 of the Texas Constitution and, therefore, the Court of Appeals erred in concluding the trial judge correctly denied ap-

pellant's motion to suppress the fruits of that illegal search.[1] The State responds that the cocaine was discovered during a valid inventory.

It is axiomatic that the Texas Constitution can provide greater protection than the Federal Constitution. It has been said that the United States Constitution provides the floor for our Constitutional rights while the various State constitutions provide the ceiling. *Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Cr.App.1991). Therefore, in order to determine whether the Texas Constitution provides greater protection than the United States Constitution in the context of inventories, we must first determine what protection is provided by the Fourth Amendment.

## II.

### UNITED STATES CONSTITUTION

The Fourth Amendment of the United States Constitution provides protection from unreasonable searches and seizures. A warrantless search is presumptively unreasonable. *Horton v. California*, 496 U.S. 128, 133 and n. 4, 110 S.Ct. 2301, 2306 and n. 4, 110 L.Ed.2d 112 (1990); *and, Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). However, an inventory has long been recognized as a valid exception to the warrant requirement of the Fourth Amendment. *See, Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *Evers v. State*, 576 S.W.2d 46 (Tex.Cr.App.1978); *and, Benavides v. State*, 600 S.W.2d 809 (Tex.Cr.App. 1980). There is no requirement that an officer obtain a search warrant to conduct an inventory if the inventory is part of a bona fide "routine administrative caretaking function" of the police. *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir.1991); *and, Evers v. State*, 576 S.W.2d 46, 50 (Tex.Cr. App.1978). Inventories serve three pur-

poses: (1) to protect the owner's property while it is in police custody; (2) to protect the police against claims or disputes over lost or stolen property; and, (3) to protect the police or public from potential danger. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). The Fourth Amendment requires only that an inventory not be a "ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *United States v. Walker*, 931 F.2d 1066, 1068 (5th Cir.1991). To prevent inventories from becoming a general rummaging, the Supreme Court encourages " '[a] single familiar standard ... to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.' " *Lafayette*, 462 U.S. at 648, 103 S.Ct. at 2610–11 (*quoting New York v. Belton*, 453 U.S. 454, 458, 101 S.Ct. 2860, 2863, 69 L.Ed.2d 768 (1981)). "The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering crime.' " *Wells*, 495 U.S. at 4, 110 S.Ct. at 1635 (*quoting, Colorado v. Bertine*, 479 U.S. 367, 376, 107 S.Ct. 738, 744, 93 L.Ed.2d 739 (1987, Blackman, J., concurring)). Thus, inventories conducted pursuant to an established departmental policy have generally been constitutional. *Opperman, supra.*

In *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), the defendant was arrested for driving while intoxicated. During an inventory of Bertine's vehicle, officers opened a closed backpack. Within the backpack,

> ... the officer observed a nylon bag containing metal canisters. Opening the canisters, the officer discovered they con-

---

1. Appellant's grounds for review state:

   (1) The Court of Appeals erred in holding that the search of the locked trunk of [appellant's] vehicle and the unopened containers therein located was constitutionally permissible under Article 1, Section 9 of the Texas Constitution.

   (2) The Court of Appeals erred in holding that the opening of the spare key container was constitutionally permissible under Article 1, Section 9 of the Texas Constitution.

   (3) The Court of Appeals erred in holding by implication that the trial court acted properly under Article 1, Section 9 of the Texas Constitution in denying [appellant's] Motion to Suppress Evidence.

tained cocaine, methaqualone tablets, cocaine paraphernalia and $700 in cash. In an outside zippered pouch of the backpack, he also found $210 in cash in a sealed envelope.

*Id.,* 479 U.S. at 369, 107 S.Ct. at 740. Bertine moved to suppress the evidence discovered during the inventory of his backpack. The Supreme Court found the inventories of the backpack and closed containers were reasonable under the Fourth Amendment:

> In the present case ... there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation ... [T]he police were potentially responsible for the property taken into their custody. By securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property.

*Id.,* 479 U.S. at 372–373, 107 S.Ct. at 741–742. The Court specifically rejected Bertine's contention that other reasonable, less intrusive, alternatives were available to the officers, holding the Fourth Amendment does not require officers to resort to a less intrusive alternative. *Id.,* 479 U.S. at 373–374, 107 S.Ct. at 742.

In *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990), Wells was arrested for driving while intoxicated and his vehicle was impounded. Officers received Wells' permission to open the trunk of the vehicle and the inventory of the vehicle revealed two marihuana cigarette butts in the ashtray and a locked suitcase in the trunk. Forcing the locks on the suitcase, officers discovered a garbage bag containing a considerable amount of marihuana. *Id.,* 495 U.S. at 2, 110 S.Ct. at 1634.

Wells moved to suppress the marihuana found in the suitcase, contending its seizure violated the Fourth Amendment. The trial judge denied the motion and the Supreme Court of Florida reversed. *State v. Wells,* 539 So.2d 464, 469 (1989). The Florida Court reasoned that under *Bertine,*

> [i]n the absence of a policy specifically requiring the opening of closed containers found during a legitimate inventory search, *Bertine* prohibits us from countenancing the procedure followed in this instance.

*Id.,* 539 So.2d at 469.

The United States Supreme Court rejected the Florida Supreme Court's holding that, under the Fourth Amendment, there must be a specific departmental policy requiring closed containers to be opened. *Wells,* 495 U.S. at 4, 110 S.Ct. at 1635. The Court found "no reason to insist that [inventories] be conducted in a totally mechanical 'all or nothing' fashion." *Id.* The Court held:

> ... A police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself. Thus, while policies of opening all containers or of opening no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. *The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.*

*Id.*

▮ Thus the Fourth Amendment permits the inventory of a closed container so long as the officer follows departmental policy or, in the officer's opinion, the search furthers the purposes of an inventory search. With the foregoing in mind, we must now determine whether the instant inventory violated the Fourth Amendment.

Bailey testified "[a]s far as the search goes, his bags, the suitcases, everything that was in the trunk was gone through ... [a]s per department policy. An inventory of the vehicle." According to Bailey, the inventory was conducted pursuant to established departmental policy; a policy which included the opening of closed containers. Further, the record indicates Bailey was unable to ascertain the contents of the containers by

examining the containers' exteriors. Finally, there is no evidence this inventory was a ruse to discover incriminating evidence. Because the Fourth Amendment permits the inventory of a closed container so long as the officer follows departmental policy or, in the officer's opinion, the search furthers the purposes of an inventory search, we hold the instant inventory was lawful under the Fourth Amendment.[2]

Having determined the instant inventory was lawful under the Fourth Amendment, we must now determine whether the Texas Constitution provides greater individual protection than the United States Constitution in the context of inventories.

## III.

### FEDERALISM

Appellant contends art. I, § 9 of the Texas Constitution provides greater protection than the Fourth Amendment in the context of inventories. Appellant's contention requires application of our decision in *Heitman v. State,* 815 S.W.2d 681 (Tex.Cr.App.1991). In *Heitman* we held the Texas Constitution may afford greater protection than its federal counterpart. *Id.,* at 690.[3] Relying on the Fourth Amendment and art. I, § 9 of the Texas Constitution, Heitman moved to suppress evidence seized from closed containers during an inventory.[4] Without reaching the merits of Heitman's claim, we concluded we were not bound by Supreme Court interpretations of the United States Constitution when analyzing and interpreting similar provisions of the Texas Constitution. *Id.* We

stated: "we decline to blindly follow the Supreme Court's decisions interpreting the Fourth Amendment in addressing art. I, § 9." *Id.* In some situations, the Texas Constitution may provide greater protection.[5]

■ The traditional role of "federalism" refers to the coordinate relationship and distribution of power between the individual states and our national government. *See,* THE FEDERALIST No. 51, at 323 (J. Madison) (C. Rossiter ed. 1961). This concept is fundamental to our system of government. Federalism allows states to provide greater protection from government intrusion than that provided in the Federal Constitution; however, states may not restrict or provide less protection than that provided by the Federal Constitution. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *see also, Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *and, Heitman, supra.* In practical application, federalism recognizes that governmental intrusion on individual rights is inevitable; however, such intrusions should be slight. The genesis of restrictions on governmental encroachment lies both within the federal and state constitutions. *See, Traylor v. State,* 596 So.2d 957, 961 (Fla.1992).

The Federal Constitution secures a common degree of protection for the citizens of all fifty states. However, the Supreme Court must exercise restraint in construing the extent of this protection for several reasons. First, in federalism, important decisions con-

---

2. In his petition for discretionary review, appellant contended the instant search violated the Fourth Amendment. However, we refused those grounds for review. Nevertheless, before we can determine whether the Texas Constitution provides greater protection, we must determine the legality of the inventory under the United States Constitution.

3. *See also, Davenport v. Garcia,* 834 S.W.2d 4, 7–10 (Tex.1992) (Texas Supreme Court acknowledged that the Texas Constitution extends greater freedom than the Federal Constitution).

4. Heitman was discovered slumped forward in his vehicle outside a store at approximately 5:30 a.m. Officers found a loaded pistol on Heitman

and arrested him for unlawfully carrying a weapon. As Heitman was transported to jail, the officers inventoried his vehicle and found a locked briefcase in the passenger compartment. The officers "jimmied" open the briefcase and found methamphetamine.

5. On remand, the Court of Appeals found the search of Heitman's briefcase to be reasonable under art. I, § 9, noting "the briefcase was one from which papers, at least, could be removed without unlocking the briefcase, the briefcase was subject to being jimmied open, and, of course, the briefcase itself was portable and could easily be moved from place to place." *Heitman v. State,* 836 S.W.2d 840, 842–843 (Tex. App.—Fort Worth 1992).

cerning basic freedoms have traditionally inhered in the states. Second, a decision by the Supreme Court is binding on all jurisdictions within the Union; an appropriate decision in one jurisdiction may be inappropriate in another and any decision by the Supreme Court precludes experimentation with potentially rewarding alternative approaches. Finally, because the federal system embraces a multitude of localities, the Supreme Court oftentimes is unfamiliar with local problems, conditions and traditions. *See generally, San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *and, Traylor, supra.*

In *Traylor v. State,* 596 So.2d 957, 961 (Fla.1992), the Florida Supreme Court noted that state courts do not suffer these prudential concerns to the same extent. Unlike their federal counterpart, state courts and state constitutions have traditionally served as the prime protectors of their citizens' basic freedoms. Further, a state court's decision construing its own constitution is controlling only as to courts within that state; the ruling will not stifle the development of alternative methods of constitutional analysis in other jurisdictions. And finally, no court is more sensitive or responsive to the needs of the diverse localities within a state, or the state as a whole, than that state's own high court. In any given state, the Federal Constitution thus represents *the floor* for basic freedoms; the State Constitution, the ceiling. *Traylor,* 596 So.2d at 961–62. *See also,* Stewart G. Pollock, *State Constitutions as Separate Sources of Fundamental Rights,* 35 Rutgers L.Rev. 707, 709 (1983). The Florida Supreme Court summarized the implications of federalism in our system of jurisprudence:

> Federal and state bills of rights thus serve distinct but complimentary purposes. The federal Bill of Rights facilitates political and philosophical homogeneity among the basically heterogenous states by securing, as a uniform minimum, the highest common denominator of freedom that can

prudently be administered throughout all fifty states. The state bills of rights, on the other hand, express the ultimate breadth of the common yearnings for freedom of each insular state population within our nation.

*Traylor,* 596 So.2d at 962.

■ Therefore, under the federalist system and the jurisdiction given this Court under art. V, § 5 of the Texas Constitution, we are bound to give primacy to our State Constitution, giving independent legal import to every phrase and clause contained therein.

## IV.

## TEXAS CONSTITUTION

■ Today, we are confronted with the issue left unanswered by *Heitman:* whether art. I, § 9 provides greater protection than the Fourth Amendment of the United States Constitution. Although the Texas Constitution may afford greater protection than the United States Constitution, efforts to breathe life into our State Constitution should not invite interpretations and policy rationale wholly unsupported by critical, legal reasoning. Therefore, it is imperative that an independent analysis of our Constitution be undertaken each time one of its provisions is to be interpreted. To determine whether our Constitution provides greater protection than its federal counterpart, we find the following factors helpful, although not independently dispositive: (A) a textual examination of the constitutional provision; (B) the Framer's intent; (C) history and application of the constitutional provision; (D) comparable jurisprudence from other states; and, (E) the practical policy considerations behind the constitutional provision.[6] We now consider these factors.

### A. Textual Examination

The Fourth Amendment provides:

---

6. *See generally,* Catherine Greene Burnett and Neil Colman McCabe, *A Compass in the Swamp: A Guide to Tactics in State Constitutional Law Challenges,* 25 Tex.Tech L.Rev. 75, 79–104 (1993) (The structure of a state constitutional argument may include textual arguments, historical argu-

ments, logical arguments, academic writings, structural arguments, prudential and policy considerations, persuasive foreign authorities, doctrinal arguments, and legislative and social facts.).

The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., amend. IV.

Art. I, § 9 provides:

The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures and searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

Tex. Const. art. I, § 9.

■ An examination of these provisions reveals clear textual similarities between the Fourth Amendment and art. I, § 9. Because of the obvious resemblance in form and choice of words of these provisions, one might be tempted to prematurely conclude that these provisions import the same meaning and, therefore, their application should be similar.[7] In theory such a technical construction appears desirable; however, the textual similarities of these provisions derive not from their intended meaning, but from a common origin. *See generally,* J.E. Ericson, *Origins of the Texas Bill of Rights,* 62 Sw. Hist.Q. 457 (1958); Rupert N. Richardson, *Framing the Constitution of the Republic of Texas,* 31 Sw.Hist.Q. 191 (1928). Further, a narrow construction leaves art. I, § 9 specifically, and the Texas Constitution generally, void of independent meaning. Construction of a constitutional provision should prevent any clause, sentence, or word from being superfluous, void, or insignificant. *Cordova v. State,* 6 Tex.App. 207 (1879); *see also, Cramer v. Sheppard,* 140 Tex. 271, 167 S.W.2d 147 (1942). Thus, homogeneity in

text alone should not be the sole basis of statutory interpretation.

■ Further, a constitutional provision is not subject to a technical construction, as is a common law instrument or statute; a constitutional provision must be interpreted so as to carry out the general principles of government. *Hunt v. State,* 7 Tex.App. 212 (1879); *Cramer, supra.* There will be instances when comparisons between the text of our State Constitution and the Federal Constitution will reveal more differences than similarities or, in contrast, when varying interpretations hang on the meaning of a single word. In such circumstances, we may find that situations demand divergence from the federal model solely based on textual construction. Unfortunately, neither situation is present in this case. The Fourth Amendment and art. I, § 9 utilize verbiage that is both vague in meaning and generic in application. Any similarity between the Fourth Amendment and art. I, § 9 appears to be merely a coincidence of historical fact. *Eisenhauer v. State,* 754 S.W.2d 159, 170 (Tex.Cr.App.1988). Therefore, our determination of the instant issue requires further analysis.

### B. Framers' Intent

Little evidence, if any, exists to demonstrate the Framers' intent in the enactment of art. I, § 9. Particularly lacking is any indication as to whether the Framers desired to convey broader protection through art. I, § 9 than that provided by the Fourth Amendment. *See, Eisenhauer v. State,* 754 S.W.2d 159 (Tex.Cr.App.1988) (Clinton, J., dissenting). *But see, Heitman, supra.* Art. I, § 9 has remained virtually unchanged from the creation of the Republic of Texas until the present. Matthew W. Paul & Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 955 (1992) (discussing an historical analysis of art. I, § 9 of the Texas Constitution). Having found no evidence of the Framers' intent behind art. I, § 9 pertaining to inventories, we turn to the origins of the provision.

---

**7.** In response to *Heitman,* commentators have argued that "although grammatically different, these constitutional provisions clearly grant the same guarantees and establish the same prerequisites to governmental action regarding search and seizure." Matthew W. Paul and Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 936 (1992); *cf,* James C. Harrington, *Framing A Texas Bill of Rights Argument,* 24 St. Mary's L.J. 399 (1993).

## C.  History and Application

There appears to have been a multitude of sources available to assist the Framers in the drafting art. I, § 9.  There are indications, although not definitive, that our Bill of Rights derived from multiple sources such as the Spanish civil law, the Magna Charta, the English Bill of Rights, the Virginia Bill of Rights, the Declaration of Independence, the United States Constitution, and the early constitutions of other states, particularly those of Virginia, North Carolina, Pennsylvania, Kentucky and Tennessee.  *See,* J.E. Ericson, *Origins of the Texas Bill of Rights,* 62 Sw.Hist.Q. 457, 458–66 (1958).  *See · also,* Matthew W. Paul & Jeffrey L. Van Horn, *Heitman v. State: The Question Left Unanswered,* 23 St. Mary's L.J. 929, 936 (1992).

For one hundred years, fundamental rights of privacy and protections against arbitrary intrusion by state and local governments were secured only to the extent granted and provided by state constitutions.  Newman, *The "Old Federalism": Protection of Individual Rights by State Constitutions in an Era of Federal Court Passivity,* 15 Conn. L.Rev. 21, 22 (1983).  The guarantees in the federal Bill of Rights were not intended to, nor did they protect against "state action."  *Barron v. Mayor of Baltimore,* 32 U.S. (7 Pet.) 242, 8 L.Ed. 672 (1833).  Therefore, at the time art. I, § 9 was drafted, the Framers had little reason to have more than a civil interest in the Fourth Amendment because the protections of the Fourth Amendment were *not* extended to the states until 1949 in *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

Although it is unclear whether the Framers looked to the Fourth Amendment for guidance in drafting art. I, § 9, it is clear that the Fourth Amendment was derived from the Massachusetts State Constitution. *Harris v. United States,* 331 U.S. 145, 158, 67 S.Ct. 1098, 1105, 91 L.Ed. 1399 (1947) (Frankfurter, J., dissenting).  Art. XIV of the 1780 Massachusetts Constitution provided:

Every subject has a right to be secure from all unreasonable searches, and seizures of his person, his houses, his papers, and all his possessions.  All warrants, thereof, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant to a civil officer, to make search in suspected places, or to arrest one or more suspected persons, or to seize their property, be not accompanied with a special designation of the persons or objects of search, arrest, or seizure; and no warrant ought to be issued but in cases, and with the formalities, prescribed by the laws.

Similarities exist between the Massachusetts Constitution, art. I, § 9, and the Fourth Amendment.  Therefore it is significant that, after an analysis of its state constitution, the Massachusetts Supreme Court determined that the Massachusetts State Constitution provided greater protection than the Fourth Amendment.  *See, Commonwealth v. Snyder,* 413 Mass. 521, 597 N.E.2d 1363, 1367 (1992); *Commonwealth v. Upton,* 394 Mass. 363, 476 N.E.2d 548, 556 (1985) ("We conclude that art. XIV provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause.").  Thus, although the Fourth Amendment was at least partially derived from art. XIV of the Massachusetts Constitution, the Supreme Court has interpreted the Fourth Amendment narrowly while the Massachusetts Supreme Court has found greater protection in its State Constitution.  Consideration of the history of the Fourth Amendment, art. XIV of the Massachusetts Constitution, and the similarities between art. I, § 9 and the Massachusetts Constitution, provides evidence that art. I, § 9 was intended to provide broader protection as well.

## D.  Comparable Jurisprudence

In his dissenting opinion in *Eisenhauer,* 754 S.W.2d at 177 n. 1, Judge Teague referred to a 1987 study which outlined, among other things, which states had accepted or rejected the United States Supreme Court's interpretation of the Fourth Amendment in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct.

2317, 76 L.Ed.2d 527 (1983).[8] At that time, only five states actively maintained judicial independence. *Id.* However, since *Eisenhauer,* a growing number of state courts have opted for judicial independence. Just as Massachusetts has interpreted its Constitution to provide greater protection than the Fourth Amendment, other states have determined their constitutions afford greater protection than the United States Constitution.[9]

To determine whether the Texas Constitution provides greater protection than the Fourth Amendment, it is incumbent on us to review the decisions of the other states who have found more protection, as well as those who have declined to do so. Of those states who have followed the Supreme Court's interpretation of the Fourth Amendment, the common denominator appears to be a desire to maintain uniformity among those decisions from the United States Supreme Court and those from the states' highest courts.[10] But, such reasoning conflicts with "[a state's highest court's] sworn duty to preserve, protect and defend the constitution and laws of [that state]." *Eisenhauer v. State,* 754 S.W.2d 159 (Tex.Cr.App.1988) (Clinton, J., dissenting).

Among the states that have found greater protection in their constitutions concerning unreasonable search and seizures, several have specifically considered the protection to be provided in an inventory. The general consensus among these states is that inventories should be limited to the original rationale behind an inventory. Officers should not be allowed to intrude into the privacy of citizens, using an inventory as a pretext to discover not readily visible evidence. As the California Supreme Court has stated, "[c]onstitutional rights [of individual citizens should] not be evaded through the route of finely honed but non-substantive distinctions." *Mozzetti v. Superior Court,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 416, 484 P.2d 84, 88 (1971) (referring to searches of closed containers during an inventory).

The California Supreme Court held a search of a camper's knapsack constitutional because a weapons search was justified when officers held an interest in protecting themselves while escorting the defendant from a primitive location at night. The Court reasoned that, in such a situation, the officer's interest in protecting themselves outweighed the defendant's privacy interest in his knapsack. *People v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 320, 531 P.2d 1099, 1104 (1975). However, the court rejected the State's argument that a subsequent intrusion into an opaque, plastic bottle and an envelope, containing contraband, inside the knapsack was constitutional under art. I, § 13 of the California Constitution. *Id.,* 119 Cal. Rptr. at 318, 531 P.2d at 1102.

In *State v. Opperman,* 89 S.D. 25, 228 N.W.2d 152 (1975), the South Dakota Supreme Court determined that an inventory of an unlocked glove compartment violated the Fourth Amendment. However, the United States Supreme Court reversed and remanded. On remand the South Dakota Supreme

---

**8.** The study entitled "Limits of the New Federalism" appeared in the January, 1987 issue of *Search and Seizure Law Report.* Judge Teague's reference to this study focused primarily on the United States Supreme Court's interpretation of the Fourth Amendment in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**9.** *See, State v. Daniel,* 589 P.2d 408, 414 (Alaska 1979); *State v. Ault,* 150 Ariz. 459, 724 P.2d 545 (1986); *People v. Brisendine,* 13 Cal.3d 528, 119 Cal.Rptr. 315, 327–28, 531 P.2d 1099, 1111–12 (1975); *People v. Hillman,* 834 P.2d 1271 (Colo. 1992); *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300, 1308–09 (1992); *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 58–59 (1974); *State v. Guzman,* 122 Idaho 981, 842 P.2d 660, 666–67 (1992); *State v. Parms,* 523 So.2d 1293, 1303 (La.1988); *State v. Brown,* 232 Mont. 1, 755 P.2d

1364, 1370 (1988); *State v. Pellicci,* 133 N.H. 523, 580 A.2d 710, 729 (1990); *State v. Hempele,* 120 N.J. 182, 576 A.2d 793, 799 (1990); *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985); *State v. Caraher,* 293 Or. 741, 653 P.2d 942, 947 (1982); *State v. Opperman,* 247 N.W.2d 673, 674–75 (S.D.1976); *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136 (1984).

**10.** *See, Bernie v. State,* 524 So.2d 988 (Fla.1988); *State v. Groff,* 323 N.W.2d 204, 207–08 (Iowa 1982); *State v. Tarantino,* 587 A.2d 1095 (Me. 1991); *People v. Bullock,* 440 Mich. 15, 485 N.W.2d 866, 868–69 (1992); *In the Matter of the Welfare of E.D.J.,* 492 N.W.2d 829 (Minn.App. 1992); *State v. Geraldo,* 68 Ohio St.2d 120, 429 N.E.2d 141, 145–46 (1981); *Dixon v. State,* 737 P.2d 942 (Okla.Crim.App.1987); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986).

Court considered the inventory under the South Dakota Constitution holding:

> ... We find that logic and sound regard for the purposes of the protection afforded by S.D. Const., Art. VI, § 11 warrant a higher standard of protection for the individual in this instance than the United States Supreme Court found necessary under the Fourth Amendment.
>
> \* \* \* \* \* \*
>
> ... [T]here must be a "minimal interference" with an individual's protected rights. We now conclude as a matter of protection under S.D. Const., Art. VI, § 11, "minimal interference" with a citizen's constitutional rights means that noninvestigative police inventory searches of automobiles without a warrant must be restricted to safeguarding those articles which are within plain view of the officer's vision.

*State v. Opperman,* 247 N.W.2d 673, 675 (S.D.1976).

The Alaska Supreme Court considered a similar issue in *State v. Daniel,* 589 P.2d 408 (Alaska 1979).[11] Daniel was arrested for driving while intoxicated and an inventory was made of his vehicle. *Id.* at 409–10. The following events occurred:

> From outside the vehicle, the trooper could see, on the back seat, a brown Samsonite briefcase with the top down and the latches open, facing toward the driver's side of the front seat. Trooper McGinnis lifted the lid of the briefcase. He saw a large plastic sack containing a green vegetable matter that appeared to be marijuana and an automatic pistol. In the file section in the lid of the briefcase, the trooper found a clear plastic sack containing a white powder.[12]

*Id.* at 410. Although the Court concluded that an inventory of a vehicle is a minimal intrusion on the owners reasonable expectation of privacy, the Court held Daniel had a

greater expectation of privacy in his closed briefcase under the Alaskan Constitution. The searching of "closed, locked or sealed luggage, containers, or packages contained within a vehicle is unreasonable and thus an unconstitutional search under the Alaska Constitution." *Id.* at 417–18.

## E. Practical Policy Considerations

As noted in part II of this opinion, the rationale behind the inventory is three-fold. First, an accurate inventory provides protection to the owner whose property is in police custody. *United States v. Mitchell,* 458 F.2d 960, 961 (9th Cir.1972). Second, the preparation of an accurate inventory protects the officers and their agency from claims of, or disputes concerning, property being lost or stolen. *United States v. Kelehar,* 470 F.2d 176, 178 (5th Cir.1972). Finally, allowing the officers to impound and inventory property protects the officers and others from potential danger. *Cooper v. California,* 386 U.S. 58, 61–62, 87 S.Ct. 788, 790–91, 17 L.Ed.2d 730 (1967). *See, South Dakota v. Opperman, supra,* (The towing and impounding of vehicles involved in accidents or illegally parked is a caretaking function performed for the safety of the public.); *Cady v. Dombrowski,* 413 U.S. 433, 436, 93 S.Ct. 2523, 2525, 37 L.Ed.2d 706 (1973) (warrantless search of a vehicle towed to a private garage was reasonable when officers believed the incapacitated driver was an off duty officer required to carry a weapon). These policies have frequently satisfied our requirement that a search be "reasonable."

## V.

## CONCLUSION

After considering the foregoing factors, we hold that art. I, § 9 provides a privacy interest in closed containers which is not overcome by the general policy considerations

---

11. Alaska's Constitution is textually closer to the language of the Fourth Amendment than is the Texas Constitution. Art. I, § 14 of the Alaska Constitution provides:

> The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated.

12. Laboratory tests revealed that the green vegetable matter was marijuana and that the white powder was cocaine. Daniel was thereafter charged with possession of an illegal substance and carrying a concealed weapon. *Id.,* at 410 n. 4.

underlying an inventory. This holding is consistent with the comparable jurisprudence discussed in Part IV, D, of this opinion. Just as those courts found greater protection under their state constitutional provisions concerning searches and seizures, we hold art. I, § 9 provides greater protection than the Fourth Amendment in the context of inventories. The officers interest in the protection of appellant's property, as well as the protection of themselves from danger and the agency from claims of theft, can be satisfied by recording the existence of and describing and/or photographing the closed or locked container.

This is not to say that officers may never search a closed or locked container, only that the officers may not rely upon the inventory exception to conduct such a warrantless search. We refuse to presume the search of a closed container reasonable under art. I, § 9 simply because an officer followed established departmental policy.[13]

Accordingly, the judgment of the Court of Appeals is reversed and this case is remanded to the trial court.

CAMPBELL, J., concurs in the judgment only believing the instant inventory violated the Fourth Amendment and that the judgments of the trial court and the Court of Appeals should be reversed on that basis.

CLINTON, Judge, concurring.

The sole issue in this cause is whether this Court should hold under Article I, § 9, of the Constitution of the State of Texas that officers conducting an inventory of an automobile lawfully taken into custody may open closed containers discovered therein, consistent with the rationale justifying inventory "searches" in general.

The Supreme Court of the United States has held that, although the goals of an inventory "search" may be attained by less intrusive means than actually opening closed containers found in car under inventory, the Fourth Amendment does not require a showing that officers failed to use such less intrusive means available so long as they conducted the inventory under police regulations requiring such opening and were not acting in a bad faith effort to obtain incriminating evidence. See, e.g., *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

The opinion written by Judge Baird correctly identifies the issue, but then spends considerable time and space restating that which under *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App.1991), and *Richardson v. State*, 865 S.W.2d 944 (Tex.Cr.App.1993), is by now settled, as well as providing an elaborate methodology for determining whether this Court is enabled to construe Article I, § 9, differently. Yet when the opinion comes to implement that examination, it basically pronounces at the end that § 9 protects "a privacy interest in closed containers which is not overcome by the general policy considerations underlying an inventory," that § 9 provides "greater protection than the Fourth Amendment in the context of inventories," and that the functions of which "can be satisfied by recording the existence of and describing and/or photographing the closed or locked container." Maj. opinion at 42.

While ultimately the opinion may be right, in my judgment other considerations and much more analysis is necessary before the Court may confidently say so, e.g., a frank assessment of the conclusion by the Supreme Court that least intrusive means are not required, based on positions taken by other state jurisdictions, views of scholarly commentators; defining just what the privacy interest of the individual is in relation to the governmental interest in inventories, and whether assaying those interests against each other is valid methodology to determine whether least intrusive means should be required. Other considerations may well come to mind after further research and upon more mature deliberation than reflected in the majority opinion.

Therefore, I join only the judgment of the Court.

---

13. Of course, if the officers obtained a valid warrant, they would be permitted to search a closed or locked container. In the alternative, the officers may conduct a warrantless search by meeting another exception to the warrant requirement. *See, e.g., Hudson v. State*, 588 S.W.2d 348 (Tex.Cr.App.1979); *and, United States v. Wright*, 588 F.2d 189 (5th Cir.1979).

MALONEY, Judge, concurring.

Believing that existing United States Supreme Court precedent makes clear that the Fourth Amendment was violated in this case, *Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) and that we need not address the Texas Constitutional issue, I concur in the result.

MEYERS, J., joins this opinion.

McCORMICK, Presiding Judge, dissenting.

Article I, section 2, of the Texas Constitution says:

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their benefit."

Today, the plurality attempts to lead this Court down the slippery slope of judicial activism by legislating in this particular case a constitutional rule of unprincipled, result-oriented decision-making as a means for judges to impose their views on others. See *Voting Behavior On The Texas Court Of Criminal Appeals, 1991–1992*, 34 So.Tx. L.Rev. 1, 36 (1993); *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. 929, 956–974 (1992) (and authorities cited therein); *State Constitutions As Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. 707, 717 (1983). It should not be this Court's role to correct the perceived injustice here by judicially legislating what it considers to be a socially or politically desirable result. See, e.g., *People v. Bullock*, 440 Mich. 15, 485 N.W.2d 866, 879–89 (1992) (Riley, J., concurring in part and dissenting in part); *Justice Stewart*, 95 Harv.L.Rev. 1, 5 (1981) (discussing the proper role of a judge). Under a proper application of principles of federalism, which, in this case, require this Court to exercise restraint, and based on this Court's historical precedents, we should hold the inventory did not violate Article I, section 9. Because the plurality fails to exercise restraint and ignores our historical precedents, I dissent.

## HEITMAN

*Heitman* merely recognizes and reaffirms this Court's long-held power to interpret the Texas Constitution to provide greater protection than the Federal Constitution. *Heitman v. State*, 815 S.W.2d 681, 690 (Tex.Cr. App.1991); see also *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Cr.App.1983). However, *Heitman* does not establish a specific rule of divergence from Fourth Amendment cases, or an analytical framework for deciding when the Texas Constitution provides greater protection than the Federal Constitution. *Id.*, 815 S.W.2d at 690 (announcing that we decline to "blindly" follow Fourth Amendment cases and then remanding the case back to the Fort Worth Court of Appeals for further consideration).[1] If this case requires an application of *Heitman*, as the plurality asserts on page eight of its opinion, then the plurality, consistent with *Heitman*, should announce it will not "blindly" follow Fourth Amendment cases and remand this case to the Ninth Court of Appeals to let it decide whether the inventory violated Article I, section 9.

*Heitman* also overrules *Eisenhauer v. State*, 754 S.W.2d 159, 162 (Tex.Cr.App.) (plurality op.), cert. denied, 488 U.S. 848, 109 S.Ct. 127, 102 L.Ed.2d 101 (1988), *Osban v. State*, 726 S.W.2d 107, 111 (Tex.Cr.App.1986) (majority op.), and *Brown v. State*, 657 S.W.2d 797, 799 (Tex.Cr.App.1983) (plurality op.), to the extent they hold we will "blindly" follow or be "bound" by Fourth Amendment cases in interpreting Article I, section 9. *Heitman*, 815 S.W.2d at 690. However, these cases do not hold that we will "blindly" follow or be "bound" by Fourth Amendment cases, or that we will abdicate our power to interpret the Texas Constitution to provide greater protection than the Federal Constitution *in appropriate cases*. See, e.g., *Brown*, 657 S.W.2d at 799. There is a distinction between saying we will "follow" a decision in a particular case versus saying we will

---

1. On remand, the Fort Worth Court of Appeals found the inventory of the contents of Heitman's locked briefcase, which is more intrusive on privacy interests than the inventory here, was rea-

sonable under Article I, section 9, and we refused the petition for discretionary review. *Heitman v. State*, 836 S.W.2d 840, 842–43 (Tex.App.—Fort Worth 1992, pet. ref'd).

"blindly" follow or be "bound" by particular decisions in future cases.

Moreover, it should be noted that much of *Heitman* was based on questionable and inaccurate secondary authority advocating a "new federalism" which, two learned commentators argue, advocates that courts should abandon their judicial role and act as super-legislatures. See *Heitman v. State, The Question Left Unanswered*, 23 St. Mary's L.J. at 962–67, 72–74 (pointing out that some proponents of the "new federalism" are uncomfortable with an inquiry into the history of the state constitution and a textual comparison with its federal counterpart, because such an approach would "deprive" legal scholars, judges, and others of the power to impose their views of justice upon the "unenlightened" masses). *Heitman* adds little to this state's jurisprudence, and this Court's prior cases still constitute valid precedent.

### HISTORICAL CONSIDERATIONS

This Court has traditionally followed Fourth Amendment cases in interpreting Article I, section 9, and the plurality offers no explanation on why it chooses to depart from this Court's historical precedents. See *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex.Cr. App.1993) (the doctrine of *stare decisis* requires that "when a rule has been once deliberately adopted and declared and uniformly followed, it should not be abandoned except upon the most urgent reasons") (Baird, J.). After the U.S. Supreme Court "federalized" most of this state's criminal law in the 1950s and 1960s, this Court said it generally would follow Fourth Amendment cases in interpreting Article I, section 9. See *Eisenhauer*, 754 S.W.2d at 162; *Osban*, 726 S.W.2d at 111; *Stephen v. State*, 677 S.W.2d 42, 44–45 (Tex. Cr.App.1984); *Brown*, 657 S.W.2d at 799; *Kolb v. State*, 532 S.W.2d 87, 89 (Tex.Cr.App. 1976).

Before the 1950s and 1960s, the primary source of Texas citizens' rights was the Texas Constitution, and most constitutional cases in Texas were decided under the Texas Constitution. See generally *State Constitutions*

*As Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. at 717; *State Courts And Constitutional Rights In The Day Of The Burger Court*, 62 Va.L.Rev. 873, 938 (1976). Therefore, this Court's pre–1950s interpretation of Article I, section 9, should offer strong guidance on how we should interpret it now. See *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. at 956–962, 962 (and cases cited therein); *State Constitutions As Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. at 718–20 (one jurist has identified several criteria to use in addressing independent state ground questions: text of the constitution, its legislative history, *preexisting state law*, structural differences between federal and state constitutions, matters of particular state interest or local concern, state traditions and public attitudes). Even *Heitman* suggests our historical precedents are a relevant consideration.[2] See *Heitman*, 815 S.W.2d at 688 (preexisting state law can assist in defining the scope of a state constitutional right).

Before the 1950s and 1960s, this Court also generally followed Fourth Amendment cases in interpreting Article I, section 9, because of the textual similarities of the two provisions, and because the two provisions embody the same basic protections. See, e.g., *Giacona v. State*, 372 S.W.2d 328, 333 (Tex.Cr.App.1962) (op. on reh'g); *Crowell v. State*, 147 Tex. Crim. 299, 180 S.W.2d 343 (1944); *Cagle v. State*, 147 Tex.Crim. 354, 180 S.W.2d 928, 937–38 (1944); *Hawley v. State*, 107 Tex. Crim. 243, 296 S.W. 556, 557 (1927); see also *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. at 956–974 (and authorities cited therein). And, in some cases, Texas courts afforded less protection than the Federal Constitution. See, e.g., *Welchek v. State*, 93 Tex.Crim. 271, 247 S.W. 524 (1923); *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. at 956–974 (and authorities cited therein).

*Cagle* is illustrative. In *Cagle*, this Court addressed whether a search warrant authorized the seizure of certain items under the Texas Constitution, and whether Texas's ap-

---

**2.** *Heitman* cites several Texas cases that have interpreted various provisions of the Texas Constitution to provide greater protection than their federal counterparts; however, none of these cases interpreted Article I, section 9. *Heitman*, 815 S.W.2d at 688–89.

plicable state exclusionary rule prohibited the admission of these items into evidence.[3] *Cagle,* 180 S.W.2d at 937–38. The applicable state exclusionary rule, like current Article 38.23, prohibited the admission of any evidence obtained in violation of the state and federal constitutions. In *Cagle,* this Court, following a long line of cases, said,

> ".... the decisions of the Supreme Court of the United States upon the question here presented should be first consulted; *and, where applicable and controlling, they should be followed.*"

(emphasis added). *Cagle,* 180 S.W.2d at 937. The *Cagle* court identified a U.S. Supreme Court case as "applicable and controlling" and applied it to Article I, section 9, without considering whether Article I, section 9, afforded any broader protection than the Fourth Amendment. *Cagle,* 180 S.W.2d at 937–38.

Neither the legislature through the legislative process nor the people of this state *through constitutional amendment* have overturned this Court's historical decisions generally interpreting Article I, section 9, consistently with Fourth Amendment cases. See *Brown,* 657 S.W.2d at 799. Texans have not hesitated to change the Texas Constitution when circumstances required. See THE *DALLAS MORNING NEWS, TEXAS AL-MANAC 1994–95, 336* (Mike Kingston ed., 1993). Under principles of federalism and *stare decisis,* we should exercise restraint and defer to the legislative processes on the issue presented by the petition for discretionary review. See *Brown,* 657 S.W.2d at 799.

Though the plurality purports to rely on what it calls the "History and Application" of Article I, section 9, it cites not one Texas case to support its conclusion that history supports its holding today. Instead, the plurality relies on an unpersuasive discussion on what it calls the "Framers' Intent"[4] and a "History and Application" of something other than relevant Texas constitutional decisions. This approach ignores the most important part of any analysis of independent state ground questions.

Other historical considerations also suggest the exercise of restraint here. Federal courts have dominated each state's search and seizure law for almost 40 years. Under principles of "old" federalism, involving the separation of powers between the states and the federal government under the Federal Constitution, the area of "independent state grounds" is not ripe for adjudication until the states regain some of the sovereignty they lost in the 1950s and 1960s. This is another reason we should continue this Court's tradition of deference to the U.S. Supreme Court on search and seizure issues.

### APPLICATION OF ARTICLE I, SECTION 9

The plurality holds Article I, section 9, provides a privacy interest in closed containers which is not overcome by the general policy considerations of an inventory. Based on the foregoing discussion, I would uphold the inventory here because there is "applicable and controlling" U.S. Supreme Court precedent, which is set out at pages three through six of the majority opinion. See, e.g., *Cagle,* 180 S.W.2d at 937–38; see also *Stephen,* 677 S.W.2d at 44–45 (upholding, under the Fourth Amendment, a departmentally established inventory of container items found in the trunk of an impounded car).

Moreover, there are other reasons, apart from whether we should "blindly" follow U.S. Supreme Court cases, to uphold the inventory in this case. Article I, section 9, says:

> "The people shall be secure in their persons, houses, papers and possessions, *from all unreasonable seizures and searches,* and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." (emphasis added).

The plurality accepts the federal rationale for upholding inventories: protection of the owner whose property is in police custody, protection of law enforcement agencies from civil claims for lost or stolen property, and protection of the officers and others from potential danger. The plurality says appel-

---

3. This was the predecessor to the current version of Article 38.23, V.A.C.C.P.

4. Our prior cases foreclose any discussion on the "Framers' Intent."

lant's privacy interest in the closed key box was not overcome by the general policy considerations underlying an inventory because protection of the agency from claims of theft "can be satisfied by recording the existence of and describing and/or photographing the closed or locked container."

However, because "reasonableness" is the constitutional standard, I would hold it is reasonable for experienced law enforcement policy-makers to determine that a lawfully arrested car owner, who is inclined to make a false claim, could be expected to claim the police took property from an area the police were not permitted to inventory.[5] See *State v. Roth*, 305 N.W.2d 501, 506 (Iowa 1981). Under the majority's rationale and holding, the agency would not be protected from such a claim. Therefore, the plurality's holding is inconsistent with the general policy considerations of an inventory.

Moreover, these considerations outweigh any limited privacy interest appellant had in the closed containers in his car. I would hold a person in appellant's position has a limited expectation of privacy in the contents of a legally impounded car that does not outweigh the general policy considerations underlying an inventory.

More importantly, the plurality ignores the plain language of Article I, section 9, which permits reasonable searches and prohibits unreasonable searches. The constitutional standard is "reasonableness." The plurality never expressly says the inventory was unreasonable; instead, it bases its holding on its predilections the police could have used other means, short of opening the key box, to protect the agency from claims of theft.[6] However, Article I, section 9, does not require what is the "most reasonable" or what a plurality of this court believes is "more reasonable." Cf. *Stephen*, 677 S.W.2d at 44 (the existence of "less intrusive alternatives" does not necessarily render the police policy

unreasonable). The inventory here was "reasonable" because of appellant's limited expectation of privacy in the contents of the legally impounded car, the general policy considerations underlying an inventory, and, according to the plurality opinion, the inventory was conducted in accordance with established and uniformly applied departmental policy. A plurality of this Court should not exercise the extraordinary power of second-guessing a uniformly applied departmental policy on inventories that, according to the plurality, does not offend the Federal Constitution.

### TEXTUAL EXAMINATION

To support the result it wants to reach in this case, the plurality also engages in an unpersuasive discussion on what it calls a "textual examination" of Article I, section 9, and the Fourth Amendment. The plurality apparently concedes that both constitutional provisions embody the same basic protections. However, the majority fails to discuss why it chooses to depart from U.S. Supreme Court precedent developed over the last 200 years by life-time appointed judges, and our historical precedents. See *Richardson v. State*, 865 S.W.2d 944, 948 (Tex.Cr.App.1993) (in interpreting Article I, section 9, we examine for guidance, among other things, Fourth Amendment analogues); *State Constitutions As Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. at 717; *Heitman v. State: The Question Left Unanswered*, 23 St. Mary's L.J. at 956–974 (and authorities cited therein).

### COMPARABLE JURISPRUDENCE

The text of the plurality opinion also says the comparable jurisprudence of California, South Dakota and Alaska is consistent with the result it reaches to day. See *State v. Daniel*, 589 P.2d 408 (Alaska 1979); *State v. Opperman*, 247 N.W.2d 673 (S.D.1976); *People v. Brisendine*, 13 Cal.3d 528, 119 Cal. Rptr. 315, 531 P.2d 1099 (1975); *Mozzetti v.*

---

**5.** This case involves a police inventory of "a closed plastic key box located under the driver's seat," which, according to the plurality, was pursuant to "established departmental policy." When the officers inventoried the key box, they already had found approximately $500,000 cash in the trunk.

**6.** What this case boils down to is the plurality's announcement of what it considers to be a "better" or "more reasonable" policy on how law enforcement authorities should conduct, and make policy with respect to, inventories. However, the issue is whether the policy, chosen by accountable law enforcement officials, is "reasonable."

*Superior Court*, 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971). To the extent these cases are relevant to how we should interpret the Texas Constitution, they do not support the analytical framework the plurality uses or the result it reaches.

*Mozzetti* was decided on Fourth Amendment grounds; therefore, it is irrelevant to an independent state ground analysis. *Id.,* 94 Cal.Rptr. at 414, 484 P.2d at 86. The *Brisendine* court used a principled analysis, *based on earlier state court precedents applying state constitutional law*, in interpreting the search and seizure provisions of California's constitution to provide greater protection than the Fourth Amendment to privacy interests in container items in the context of an inventory. *Id.,* 119 Cal.Rptr. at 325–31, 531 P.2d at 1109–1115. And in 1982, Californians abrogated *Brisendine* by constitutional amendment. See *In re Lance*, 37 Cal.3d 873, 210 Cal.Rptr. 631, 634, 694 P.2d 744, 747 (1985). And in 1990, apparently after California courts proceeded far down the slippery slope of judicial activism, Californians attempted to further limit the California courts from imposing their views on the citizenry through Proposition 115 entitled "Crime Victims Justice Reform Act" whose stated purpose was to adopt "comprehensive reforms. . . . needed in order to restore balance and fairness to [California's] criminal justice system" by, among other things, abrogating several judicial decisions and requiring California courts to construe certain enumerated criminal rights consistently with the Federal Constitution. See generally *Raven v. Deukmejian,* 52 Cal.3d 336, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990). The California "new federalism" experience offers no support to what the plurality does today, and it actually supports an exercise of restraint.

*Opperman* also used a principled analysis, based on earlier U.S. Supreme Court authority and state court precedents applying state constitutional law, in deciding the South Dakota Constitution provided more protection than the Fourth Amendment to privacy interests in container items in the context of an inventory. *Id.,* 247 N.W.2d at 675. And, in *State v. Flittie,* the South Dakota Supreme Court "modified" *Opperman,* based on U.S.

Supreme Court authority, to provide less protection than what it had granted in *Opperman. Flittie,* 425 N.W.2d 1, 5–6 (S.D. 1988). The Chief Justice characterized this "modification" as a "reversal" of *Opperman. Flittie,* 425 N.W.2d at 6 (Wuest, C.J., specially concurring). And, in *State v. Hejhal,* the South Dakota Supreme Court, based in part on U.S. Supreme Court authority, held a police inventory of the contents of a defendant's wallet, which is more intrusive on privacy interests than the inventory in this case, did not violate the South Dakota Constitution. *Id.,* 438 N.W.2d 820, 821–22 (S.D.1989). One dissenting opinion lamented that *Opperman* was being "whittled away." *Hejhal,* 438 N.W.2d at 822 (Henderson, J., dissenting). The South Dakota "new federalism" experience does not support what the plurality does today, and South Dakota cases after *Opperman* actually support upholding the inventory in this case. See *Hejhal,* 438 N.W.2d at 822.

*Daniel* also used a principled analysis, based on earlier U.S. Supreme Court authority and state court precedents applying state constitutional law, in deciding the Alaska Constitution provided more protection than the Fourth Amendment to privacy interests in container items in the context of an inventory. *Id.,* 119 Cal.Rptr. at 325–31, 531 P.2d at 1109–1115. Moreover, Alaska, unlike Texas, has traditionally granted its citizens more personal freedom than required by the Federal Constitution. For example, Alaska was the only state in the nation to decriminalize the possession of small amounts of marijuana in the privacy of one's home. Texas has no such tradition.

The cases cited in footnote eight of the plurality opinion also do not support the analytical framework the plurality uses or the result it reaches. Most of the cases cited in footnote eight also used a principled analysis, based on earlier state court decisions applying state constitutional law, in interpreting the particular state constitutional provision to provide greater protection than Fourth Amendment cases on various search and seizure issues. See *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300, 1310 (1992); *State v. Guzman,* 122 Idaho 981, 842 P.2d 660,

666–67 (1992); *State v. Hempele,* 120 N.J. 182, 576 A.2d 793, 799–80 (1990) (interpreting the New Jersey Constitution to provide New Jersians a reasonable expectation of privacy in the garbage they leave on the curb for collection); *State v. Jackson,* 102 Wash.2d 432, 688 P.2d 136, 138–44 (1984) (also recognizing a "substantial difference" between the texts of the Washington and Federal Constitutions); *State v. Caraher,* 293 Or. 741, 653 P.2d 942, 948–52 (1982).

In *Ault,* the Arizona Supreme Court relied on prior cases and textual differences between the Arizona and Federal Constitutions, not applicable to Texas. *State v. Ault,* 150 Ariz. 459, 724 P.2d 545, 552 (1986). In *Hillman,* the Colorado Supreme Court, in upholding a warrantless search of garbage left by the side of the road for collection, interpreted the Colorado Constitution consistently with Fourth Amendment cases. *People v. Hillman,* 834 P.2d 1271, 1276–78 (Co.1992). In *Kaluna,* the Hawaii Supreme Court, in striking down a strip search, used a principled analysis, based, in part, on policy reasons for departing from Fourth Amendment cases. *State v. Kaluna,* 55 Haw. 361, 520 P.2d 51, 58–60 (1974). In *Parms,* the Louisiana Supreme Court decided a DWI roadblock violated both the Louisiana and Federal Constitutions without setting out any specific rule of divergence from Fourth Amendment cases, and also noted the "explicit" textual differences between the two relevant constitutional provisions, which is not applicable to Texas. *State v. Parms,* 523 So.2d 1293, 1301–1303 (La.1988). In *Brown,* the Montana Supreme Court interpreted the Montana Constitution consistently with Fourth Amendment cases while noting the Montana Constitution grants "rights beyond that inferred from the" Federal Constitution because of significant textual differences between the two relevant constitutional provisions. *State v. Brown,* 232 Mont. 1, 755 P.2d 1364, 1370–71 (1988). *Pellicci* interpreted the New Hampshire Constitution consistently with Fourth Amendment cases. *State v. Pellicci,* 133 N.H. 523, 580 A.2d 710, 713–19 (1990), and 580 A.2d at 719–23 (Brock, C.J., concurring specially). And, *Johnson* decided

a warrantless arrest issue under the New York Constitution because it could not find a controlling U.S. Supreme Court case or other Fourth Amendment cases for guidance. *People v. Johnson,* 66 N.Y.2d 398, 497 N.Y.S.2d 618, 623–24, 488 N.E.2d 439, 444–45 (1985).

The plurality opinion also asserts the out-of-state cases in footnote nine, that follow Fourth Amendment cases, apparently do so solely to maintain uniformity among the decisions of the U.S. Supreme Court and those states' highest courts, which "conflicts" with a highest state court's duty to protect state constitutional rights. However, these cases also do not support the proposition for which the plurality cites them.

For example, the Florida Supreme Court had interpreted the search and seizure provision of the Florida Constitution, which was similarly worded to Article I, section 9, and the Fourth Amendment, as providing more protection than the Fourth Amendment. See *Florida v. Casal,* 462 U.S. 637, 637–39, 103 S.Ct. 3100, 3101–02, 77 L.Ed.2d 277 (1983) (Burger, C.J., concurring). Floridians, like Californians, promptly amended their constitution to require their courts to interpret Florida search and seizure law consistently with U.S. Supreme Court Fourth Amendment decisions. See *id.* That is why the Florida Supreme Court in *Bernie v. State* [7] interpreted that amendment to the Florida Constitution as not providing any greater protection than the Fourth Amendment, and not solely because of a desire to maintain uniformity or to avoid its duty to safeguard state constitutional rights. The Florida Supreme Court failed to exercise restraint, and Floridians amended their constitution to prevent the judiciary from judicially legislating what it considered to be socially desirable results. This amendment also prevents the Florida courts from interpreting the Florida Constitution more broadly than the Federal Constitution in appropriate cases.

In two of the cases cited in footnote nine, the defendants did not properly brief or raise independent state grounds. See *In the Matter of the Welfare of E.D.J,* 492 N.W.2d 829,

---

**7.** 524 So.2d 988 (Fla.1988) (cited in the plurality    opinion at page 40, footnote 9).

830–31 (Minn.App.1992), rev'd, 502 N.W.2d 779 (Minn.1993) (adopting a stricter standard than required by Fourth Amendment cases in determining whether a seizure has occurred); *State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986). In another case, the Michigan Supreme Court, over a vigorous dissent, actually interpreted its state constitution as providing more protection than the Eighth Amendment on an issue totally unrelated to this case. See *Bullock,* 485 N.W.2d at 879–89. In another case, the Iowa Supreme Court advanced several policy reasons other than a "desire to maintain uniformity" not to interpret the Iowa Constitution as providing greater protection than the Federal Constitution. See *State v. Groff,* 323 N.W.2d 204, 207–08 (Io.1982). Two other cases cited in footnote nine declined to interpret the relevant provisions of their constitutions more broadly than the Federal Constitution primarily because their constitutional provisions, like Texas', are similarly worded to the Fourth Amendment. See *State v. Geraldo,* 68 Ohio St.2d 120, 429 N.E.2d 141, 145 fn. 5 (1981), cert. denied, 456 U.S. 962, 102 S.Ct. 2038, 72 L.Ed.2d 486 (1982); *Dixon v. State,* 737 P.2d 942 (Okla.Crim.App.1987). In the other case cited in footnote nine, the court gave no reasons for interpreting its state constitution consistently with the Federal Constitution. See *State v. Tarantino,* 587 A.2d 1095 (Me.1991).

The plurality's analytical framework and holding are not consistent with the comparable jurisprudence discussed at pages 16 to 19 of the majority opinion.

### *CONCLUSION*

Today, the plurality attempts to make this Court's voice one of power, not reason. The plurality opinion applies no objective criteria, and ignores relevant historical precedents in reaching a result it deems socially desirable for the "unenlightened masses." The constitutional rule advocated by the plurality today is the Texas Constitution means whatever five elected judges to this Court says it means. Texas citizens must be informed they have the power to change decisions like this to ensure reasonable measures to protect local law enforcement agencies from false civil claims for lost or stolen property. Cf.

*Casal,* 462 U.S. at 637–39, 103 S.Ct. at 3100–02 (Burger, C.J., concurring). Forty years of this kind of judicial activism is enough, and I dissent.

WHITE, J., joins.